### ALAN HUNTE ET AL. *v.* RICHARD BLUMENTHAL, ATTORNEY GENERAL, ET AL.
### (15356)

Peters, C. J., and Callahan, Borden, Berdon, Norcott, Katz and Palmer, Js.

Argued May 28—officially released July 23, 1996

*Thomas P. Mullaney III*, for the appellants (plaintiffs).

*Jane S. Scholl*, associate attorney general, with whom were *Kristine D. Ragaglia*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellees (defendants).

PETERS, C. J. The sole issue in this appeal is whether, pursuant to General Statutes §§ 4-165 and 5-141d,[1] foster

---

[1] General Statutes § 4-165 provides in relevant part: "Immunity of state officers and employees from personal liability. No state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment. Any person having a complaint for such damage or injury shall present it as a claim against the state under the provisions of this chapter. . . ."

General Statutes § 5-141d provides in relevant part: "Indemnification of state officers and employees. Duties of attorney general. Exceptions. (a) The state shall save harmless and indemnify any state officer or employee, as defined in section 4-141, and any member of the Public Defender Services Commission from financial loss and expense arising out of any claim, demand, suit or judgment by reason of his alleged negligence or alleged deprivation of any person's civil rights or other act or omission resulting in damage or injury, if the officer, employee or member is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious.

"(b) The state, through the attorney general, shall provide for the defense of any such state officer, employee or member in any civil action or proceeding in any state or federal court arising out of any alleged act, omission or

parents qualify as "employees" of the state and are, therefore, eligible for defense and indemnification in a wrongful death action brought by the estate of a foster child. The plaintiffs, Alan and Dawne Hunte, brought an action against the defendants, the state of Connecticut and the attorney general for the state of Connecticut,[2] seeking a declaratory judgment to determine their statutory rights to defense and indemnification. On the basis of stipulated facts, the trial court held that the plaintiffs did not qualify as state "employees" and therefore were not entitled to relief. The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment of the trial court.

The underlying facts are undisputed. At all times relevant to this case, the plaintiffs were foster parents licensed by the state. On October 15, 1990, the department of children and youth services (department)[3]

deprivation which occurred or is alleged to have occurred while the officer, employee or member was acting in the discharge of his duties or in the scope of his employment, except that the state shall not be required to provide for such a defense whenever the attorney general, based on his investigation of the facts and circumstances of the case, determines that it would be inappropriate to do so and he so notifies the officer, employee or member in writing.

"(c) Legal fees and costs incurred as a result of the retention by any such officer, employee or member of an attorney to defend his interests in any such civil action or proceeding shall be borne by the state only in those cases where (1) the attorney general has stated in writing to the officer, employee or member, pursuant to subsection (b), that the state will not provide an attorney to defend the interests of the officer, employee or member, and (2) the officer, employee or member is thereafter found to have acted in the discharge of his duties or in the scope of his employment, and not to have acted wantonly, recklessly or maliciously. . . .

"(d) The provisions of this section shall not be applicable to any state officer or employee to the extent he has a right to indemnification under any other section of the general statutes."

[2] We shall refer to the defendants collectively as "the state."

[3] Effective July 1, 1993, the department of children and youth services was succeeded by the department of children and families. See General Statutes § 17a-1 (c).

placed with the plaintiffs Lisa Sledgeski, a minor under the protection of the department pursuant to an order of temporary custody. On July 7, 1991, Lisa drowned in a swimming pool accident at the plaintiffs' home. Subsequently, Lisa's estate brought a wrongful death action against the plaintiffs. That action is now pending.

The plaintiffs sought to have the state provide defense and indemnification in the wrongful death action. Their claim is predicated on §§ 4-165 and 5-141d. The state denied the plaintiffs' request on the ground that they were independent contractors rather than "employees" as required under the statutes. Opinions, Conn. Atty. Gen. No. 93-013 (June 14, 1993). The plaintiffs then brought the present action for declaratory relief.[4] The trial court ruled for the state, holding that the plaintiffs were not entitled to protection under §§ 4-165 and 5-141d because they were not state "employees" as that term is defined in General Statutes § 4-141.[5]

The plaintiffs appeal from the judgment of the trial court. They claim that, because the department retained the right to exercise broad control over their actions as foster parents, the state had effectively entered into an employer-employee relationship with them. The state, to the contrary, contends that the plaintiffs enjoyed a great degree of autonomy and independent judgment and, therefore, were properly characterized as independent contractors and not employees.[6] We

[4] The record supports the trial court's exercise of subject matter jurisdiction. See Practice Book § 390 (d).

[5] General Statutes § 4-141 provides in relevant part: "Definitions. As used in this chapter . . . 'state officers and employees' includes every person elected or appointed to or employed in any office, position or post in the state government, whatever his title, classification or function and whether he serves with or without remuneration or compensation, including judges of probate courts and employees of such courts. . . ."

[6] The state also claims that the plaintiffs were not "agents" of the state, and that, in the alternative, if they were agents of the state, §§ 4-165 and 5-141d apply only to "employees." Because we conclude that the plaintiffs were "employees" within the meaning of § 4-141, we do not address these claims.

agree with the plaintiffs that, at the time of Lisa's death,[7] they were "employees" of the state as that term is used in §§ 4-165 and 5-141d and thus are entitled to defense and indemnification.

In so deciding, we are mindful of the difficult choices that confront the state when it removes a child from an unhealthy environment and places that child in a foster home. The state has the double onus of taking a child from his or her natural parents, and of ensuring that the chosen foster parents provide adequate attention, support and guidance. We also recognize that insofar as our decision increases the state's financial responsibility to foster parents, it may tend also to increase the state's burden in providing this invaluable service. We further recognize that the state may find it reasonably advantageous to promulgate extensive foster care regulations rather than to engage in more expensive monitoring techniques. Sensitivity to the beneficence of the foster care program and the necessity of detailed regulations, however, does not permit us to ignore well established legal principles regarding the employer-employee relationship.

I

Our review of the judgment of the trial court in favor of the state is, under the circumstances of this case, plenary. The trial court rendered its judgment on the basis of the parties' stipulation of facts, and that stipulation informs the issue on appeal as well. *Rich-Taubman Associates* v. *Commissioner of Revenue Services*, 236 Conn. 613, 618, 674 A.2d 805 (1996). The determination of legal principles that govern the uncontested facts of a party's employment status is a question of law. See *Spring* v. *Constantino*, 168 Conn. 563, 574, 362 A.2d

---

[7] In 1994, the legislature enacted General Statutes § 17a-114a, which extends parental immunity to foster parents. Because Lisa's death preceded the effective date of § 17a-114a, we do not address the effect of this statute.

871 (1975); *Darling* v. *Burrone Bros., Inc.,* 162 Conn. 187, 195, 292 A.2d 912 (1972).

To decide whether foster parents are "employees" within the meaning of §§ 4-165 and 5-141d, we must begin with the language of the statutes. *Herbert S. Newman & Partners* v. *CFC Construction Ltd. Partnership,* 236 Conn. 750, 756, 674 A.2d 1313 (1996). Section 4-165 provides in relevant part that "[*n*]*o state officer or employee* shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment." (Emphasis added.) Section 5-141d provides in relevant part that "[t]he state shall save harmless and indemnify *any state officer or employee* . . . from financial loss and expense arising out of any claim, demand, suit or judgment by reason of his alleged negligence . . . if the officer [or] employee . . . is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious." (Emphasis added.)

Construed together, these two statutes protect state employees acting within the legitimate scope of their employment from personal liability for negligence. "The manifest legislative intent expressed by chapter 53 [of which § 4-165 is a part] is that an employee is immune where and because the state may be sued, and that the state may be sued in instances where a private person would be liable. See [General Statutes] § 4-160 (a). This would include the vicarious liability of a private person for the acts of his employees arising out of the scope of their employment under the doctrine of agency or respondeat superior." *Spring* v. *Constantino,* supra, 168 Conn. 571. Section 5-141d similarly evinces the legislature's intent that the state indemnify and defend any officer or employee sued for negligent conduct occurring in the course of his or her employment.

Although the plaintiffs are not "officers" under §§ 4-165 or 5-141d, they contend that they are entitled to protection under these statutes as "employees." Both §§ 4-165 and 5-141d refer to § 4-141 for the definition of the term "employees."[8] Section 4-141, in turn, provides that the term "employees" includes "every person elected or appointed to or employed in any office, position or post in the state government, whatever his title, classification or function and whether he serves with or without remuneration or compensation . . . ."

Whether foster parents are entitled to defense and indemnification as state "employees" under §§ 4-165 and 5-141d depends, therefore, on a proper interpretation of § 4-141. We are guided by settled principles of statutory construction that assist us in ascertaining the intent of the legislature. *Petco Insulation Co.* v. *Crystal*, 231 Conn. 315, 321, 649 A.2d 790 (1994). "The legislative intent is to be discerned by reference to the language of the statute, its legislative history and surrounding circumstances, the policy the [statute] was designed to implement, and the statute's relationship to the existing legislation and common law principles governing the same subject matter. *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 764, 628 A.2d 1303 (1993)." *Glastonbury Volunteer Ambulance Assn., Inc.* v. *Freedom of Information Commission*, 227 Conn. 848, 854, 633 A.2d 305 (1993).

Neither the language of § 4-141 nor the legislative histories of §§ 4-141, 4-165 or 5-141d illuminate the definitional boundaries of the term "employees." We are mindful that §§ 4-165 and 5-141d are in derogation of sovereign immunity and therefore must be strictly construed. *Spring* v. *Constantino*, supra, 168 Conn. 570.

---

[8] Although § 4-165 does not explicitly mention § 4-141, § 4-141 is the definitional section of chapter 53, entitled "Claims Against the State," of which § 4-165 is a part.

Strict construction does not, however, abrogate the manifest policy motivating these statutes, namely, the protection of state employees from liability for negligent acts that occur in the course of employment. Id., 571. Strict construction does not preclude us from recognizing groups or persons who, in accordance with recognized tenets of statutory construction, legitimately fall within the definition of the term "employees."

"In the absence of guidance from the language of the statute or the legislative history, we look to common law principles . . . . It is assumed that all legislation is interpreted in light of the common law at the time of its enactment."[9] (Internal quotation marks omitted.) *Keeney* v. *Old Saybrook*, 237 Conn. 135, 162, 676 A.2d 795 (1996); cf. *Bourgeois* v. *Cacciapuoti*, 138 Conn. 317, 320, 84 A.2d 122 (1951) ("[w]e have, in [workers'] compensation cases, uniformly given to the term ['employee'] its common-law definition"). The trial court applied the common law "right to control" test and concluded that because the state's control did not extend to "the social, emotional, educational, and parental relationship" between foster parent and child, the "[p]laintiffs [had] not proven that they [were] employees."[10] We agree with the state that the trial court

---

[9] This assumption is buttressed by the legislative history of the claims against the state act, of which §§ 4-141 and 4-165 are each a part. George W. Oberst, the director of the legislative council, referred, at least indirectly, to common law principles of tort liability when he recognized that "[w]ere the state liable in law for its torts, it would be liable in the same fashion and to the extent as its employees for damage or injury caused by such employees in the course and within the scope of their employment." Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., p. 922.

[10] The trial court also determined that the plaintiffs were not "employees" of the state as that term is used in General Statutes §§ 5-196 (i), (*l*) or (q) (defining "employee," "full-time employee" and "part-time employee" respectively for purposes of State Personnel Act) and 5-154 (*l*) (defining "state employee" for purposes of State Employees Retirement Act). Because the statutes at issue in this case—§§ 4-165 and 5-141d—refer only to § 4-

invoked the proper test. We conclude, however, that the trial court applied the right to control test improperly, because, under all the circumstances, the plaintiffs qualify as employees of the state and are not independent contractors.

## II

The legal incidents of the employer-employee relationship, on the one hand, and the employer-independent contractor relationship, on the other, are well established. "In *Alexander* v. *R. A. Sherman's Sons Co.*, 86 Conn. 292, 297, 85 A. 514 [1912], we adopted the definition that [an] independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer, except as to the result of his work. This definition has been amplified in subsequent cases but at no time has the basic principle been altered. . . . The fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the *right to control* the means and methods of work. *Beaverdale Memorial Park, Inc.* v. *Danaher*, 127 Conn. 175, 179, 15 A.2d 17 [1940] . . . ." (Citation omitted; emphasis added; internal quotation marks omitted.) *Silverberg* v. *Great Southwest Fire Ins. Co.*, 214 Conn. 632, 639, 573 A.2d 724 (1990); see also 2 Restatement (Second), Torts § 409, comment (b) (1965) (an "employer has no power of control over the manner in which work is to be done by the [independent] contractor"). The issue before us is whether the state, through the department, has reserved the right to control foster parents in the discharge of their duties so as to render foster parents "employees" for purposes of §§ 4-165 and 5-141d. We conclude that the department has done so.

141 for the definition of the term "employees," we do not decide whether foster parents qualify as "employees" under any other statutory definition.

The fountainhead of the state's right to control foster parents is the statutory scheme requiring the department to guarantee the welfare of foster children. It is the commissioner of the department, not the foster parent, who is designated as the guardian of children placed in foster care. General Statutes § 46b-129 (d) ("[t]he commissioner shall be the guardian of such child or youth for the duration of the commitment").[11] As the guardian of foster children, the commissioner has the *"obligation of care and control,* the right to custody and the duty and authority to make major decisions affecting [the] minor's welfare . . . ." (Emphasis added.) General Statutes § 17a-93 (d). The commissioner, or his agent, *"shall exercise careful supervision of each child* under his guardianship or care and shall maintain such contact with the child and his foster parents as is necessary to promote the child's safety and his physical, educational, moral and emotional development. He shall [also] maintain such records and accounts as may be necessary for the proper supervision of all children under his guardianship or care." (Emphasis added.) General Statutes § 17a-98; see *In re Barbara J.,* 215 Conn. 31, 41–42, 574 A.2d 203 (1990) (discussing duty of department to receive reports pertaining to supervision of foster children).

A necessary corollary of the department's "obligation of care and control" over foster children is its authority to exercise that control. It is true, as the state points out, that foster parents currently decide "when the child goes to bed at night, when enough television time has been had, or when the child may go swimming." Foster parents have this discretion, however, only because the department has chosen not to take it away. Nothing prevents the department from enacting regulations, pur-

[11] See also *Vonner* v. *Dept. of Public Welfare,* 273 So. 2d 252, 256 (La. 1973) ("[i]t is the [d]epartment, not the foster parents, who has the legal custody of the child").

suant to General Statutes § 17a-90 (c),[12] that specify the hour at which a child must go to bed, that limit the amount of television a child may watch or that restrict the hours a child may spend in the pool. Indeed, at oral argument, counsel for the state conceded that the department has the *authority* to make day-to-day decisions concerning the activities of the foster child.

Furthermore, it is immaterial that the department may not, at all times, exercise the full extent of its power. "An employer-employee relationship does not depend upon the actual exercise of the right to control. The right to control is sufficient." *Latimer* v. *Administrator*, 216 Conn. 237, 248, 579 A.2d 497 (1990) (construing part A of "ABC" test for determining employer-employee relationship under Unemployment Compensation Act); see *Bourgeois* v. *Cacciapuoti*, supra, 138 Conn. 321.

The state contends that the department's obligation is "merely to monitor" the daily care provided to foster children. We are unpersuaded. The statutes place an affirmative duty on the department to ensure that foster placement redounds to the benefit of the child. Moreover, the right to monitor necessarily "embodies the logical inference that the . . . monitoring had a purpose and that, if the care given the [foster children were] unsatisfactory, [the department] could, and would, intervene and take corrective measures. That right of intervention, which we believe clearly exists under the facts, evinces a right to control and direct the [foster parents] . . . ." *Latimer* v. *Administrator*, supra, 216 Conn. 251; see also *Kern* v. *Steele County*, 322 N.W.2d 187, 189 (Minn. 1982) (Wahl, J., dissenting) ("[s]uch close monitoring indicates that the foster-care

---

[12] General Statutes § 17a-90 (c) requires the commissioner to "issue such regulations as he may find necessary and proper to assure the adequate care, health and safety of children under his care and general supervision."

parent is in a very different situation from that of the independent contractor"). We are persuaded that this statutory scheme confers on the state, through the department, a right to control foster parents sufficient to satisfy the right to control test.[13]

The foster parent regulations promulgated by the department pursuant to § 17a-90 (c); see footnote 12; further support our conclusion that the state holds the right to control foster parents. Although the state, in its brief, contends that the department "does not direct

[13] The state cites *Spring* v. *Constantino*, supra, 168 Conn. 563, and *Silverberg* v. *Great Southwest Fire Ins. Co.*, supra, 214 Conn. 632, in support of its position that the department had not entered into an employer-employee relationship with the plaintiffs. Both cases are inapposite. In *Spring*, the issue was whether a public defender qualified for indemnity under § 4-165. We concluded that, although the state has the right to control public defenders prior to the time when the attorney-client relationship attaches, at that point, "the public defender is free to act in behalf of his client as if he had been employed and retained by the defendant whom he represents." *Spring* v. *Constantino*, supra, 575. Once the attorney-client relationship attaches, the state has no right to interfere "with the control of that defense in any greater degree than with the conduct of a defense by a privately employed attorney." Id. Because the alleged malpractice that precipitated the suit against the public defender in *Spring* arose in the course of this attorney-client relationship, the public defender was not an employee of the state. Id., 575–76. Unlike the plaintiffs in the present case, the plaintiff in *Spring*, by the very nature of his job, could not have been both a servant of the state and a servant of his client, a defendant whom the state had been prosecuting. Id., 575.

*Silverberg* v. *Great Southwest Fire Ins. Co.*, supra, 214 Conn. 632, also involved the liability of a government entity for actions of an attorney. In that case, the city of Norwich brought a malpractice action against its assistant corporation counsel. An issue on appeal was whether the attorney qualified as an "employee" pursuant to the city's liability insurance policy. Id., 633. In holding that the attorney did not qualify as an employee, we determined that "while the result of the [attorney's] work may have been subject to the city's control, as with his other clients, the *means and methods* by which the [attorney] reached that result were not." (Emphasis added.) Id., 640. Thus, contrary to the state's view of *Silverberg*, we explicitly determined that the city had lacked the right and authority to exert control over the attorney's day-to-day activities. Because we conclude in the present case that the department *did* have the right and authority to exercise control over the plaintiffs, *Silverberg* is not controlling.

foster parents in the details of their parenting," these regulations amply demonstrate that foster parents do not possess the autonomy and discretion normally associated with independent contracting.[14] See *Alexander*

---

[14] Sections 17a-145-99 through 17a-145-101 of the Regulations of Connecticut State Agencies (formerly §§ 17-48-99 through 17-48-101) set forth the requirements for foster care. We quote them in full to demonstrate how thoroughly the department has regulated foster care:

"[Section] 17a-145-99. Definitions

" 'Foster homes' and 'adoptive homes' are child-care facilities which are private family homes caring for not more than five children, with the following exceptions:

"(a) When local ordinances specify a smaller number of children who may be cared for, in which case such smaller number shall be the maximum;

"(b) Not more than two children under two years of age, including the foster or adoptive parents' own children, may be cared for unless supervised by an additional competent full-time adult for each additional one or two children;

"(c) A licensed foster or adoptive home may not care for more than three non-ambulatory children who are incapable of self-preservation.

"[Section] 17a-145-100. Physical requirements of home. Food. Water. Milk. Clothing. Privacy.

"(a) Dwellings and furnishings shall be clean, comfortable and in good repair.

"(b) Each room used for sleeping purposes located in a basement or on the first or second floor shall have two approved means of egress in case of fire or other disaster. All floors above the second floor, if used for children in care, shall have two exits which are remotely located, safe, unobstructed and well lighted. A determination of reasonable fire safety shall be established for all foster and adoptive homes. Emergency evacuation plans shall be established and practiced at least quarterly with the children.

"(c) The home and grounds shall be reasonably free from anything that would constitute a hazard to children. Peeling indoor and outdoor house paint accessible to the children must be determined to be non-toxic. Equipment used by the children shall not be painted or covered by any material which is poisonous.

"(d) There shall be sufficient indoor and outdoor space, ventilation, toilet facilities, light and heat to ensure the health and comfort of all members of the household.

"(e) All auxiliary heating systems shall comply with state and local building codes.

"(f) Sleeping rooms for children shall be used only for sleeping purposes and shall contain a window to provide egress in case of fire or other emergency in conformity with the state fire safety code.

"(g) Foster and adoptive children under the age of five shall sleep on

v. *R. A. Sherman's Sons Co.*, supra, 86 Conn. 297. Pursuant to the regulations, foster parents are under an affirmative duty, among other things, to report immediately "[u]nauthorized absences of a [foster] child . . . to the

---

the same floor and in close proximity to foster or adoptive parents or a responsible adult.

"(h) A separate bed shall be provided for each child, but siblings of the same sex may sleep together in a double bed with the approval of the commissioner or his designee.

"(i) No child three years or older shall be permitted to share a bedroom with another child of the opposite sex or with any adult person except a child of the foster or adoptive parents, of the same sex as the child, who has attained adulthood. Each such case shall be evaluated in terms of the disparity in age and appropriateness of such arrangement.

"(j) No more than four children, including the foster or adoptive parents' own children, shall sleep in the same room.

"(k) All food for human consumption, food storage and preparation, personal cleanliness and general care of the home must meet prevailing state and local board of health standards.

"(*l*) Water supply shall be adequate and safe. If the home is not served by public water supply, the water shall be analyzed and approved by the state or local department of health or by a private water-testing laboratory approved by the state department of health services at the time of initial licensure and at any subsequent time the department deems such testing is necessary. Adequate sewage and garbage facilities shall be maintained.

"(m) If milk or milk products provided by the foster home for consumption by the children in care are not pasteurized, the foster parents must submit to the department proof that the milk or milk products are licensed by the state department of agriculture.

"(n) The child's clothing shall be kept clean, in good condition, and shall be in keeping with the standards of the community. Provision shall be made for the safe storage of the child's clothing and personal possessions.

"(o) Each child shall be afforded privacy relevant to his growth and development.

"[Section] 17a-145-101. Requirements relative to foster or adoptive parents

"(a) Foster and adoptive parents and other members of the household shall be free of communicable disease, physical or mental infirmities which would interfere with their ability to care for children, and shall submit proof thereof from a licensed physician or his designee at the time of original licensure and at any subsequent time the commissioner or his designee suspects there is a serious illness with any member of the family.

"(b) Foster or adoptive parents shall notify the department whenever they or a member of the family contract a communicable disease or if they develop a physical infirmity which may interfere with their child-caring ability.

department followed by a written report within a reasonable period of time"; Regs., Conn. State Agencies § 17a-145-101 (d); to *"comply with the guardian's plan for the child and work cooperatively with the guardian*

"(c) The provider shall report in writing to the department on the next working day any circumstances which alter the service as originally licensed, or statement of fact in the application for license. The provider shall also report to the department immediately by telephone, or no later than the next working day, any serious injury or death of a child in care or any fire in the home. This shall be followed up in writing within a reasonable period of time.

"(d) Unauthorized absences of a child in care shall be reported immediately by telephone, or not later than the next working day, to the department followed by a written report within a reasonable period of time. When such absences occur outside of normal working hours as on weekends and holidays and the department cannot be notified, the foster or adoptive parent shall also report absences to the police.

"(e) Prior to being licensed, adoptive parents shall have a complete physical examination the results of which shall be reported to the department on such forms as approved by the commissioner. All children of the adoptive parents residing in the home shall also have physical examinations and a written statement from the examining physician regarding their health that they are free of communicable disease.

"(f) Foster and adoptive parents and other members of the household shall be emotionally healthy and of good character, habits and reputation.

"(g) Foster and adoptive parents shall have an income sufficient to meet their family needs. Monies received on behalf of the child shall be expended for the care of the child.

"(h) Both foster or both adoptive parents shall not be employed outside of the home except by agreement with the placing agency, the agreement being based on the finding that such employment will not interfere with the supervision and care of the child. Whenever the parents are both away from the home, a competent adult shall be left in charge or other suitable arrangements approved by the commissioner or his designee made for the care of the child.

"(i) Foster and adoptive parents shall comply with the guardian's plan for the child and work cooperatively with the guardian in all matters pertaining to the child's welfare.

"(j) No other children shall be taken by the parents without the consent of the commissioner or his designee. The parents shall not have roomers or boarders without the approval of the commissioner or his designee. They shall not take additional children from other agencies or on a private basis without the prior knowledge and approval of the commissioner or his designee. In no case shall they accept a greater number of children than their licensed capacity.

"(k) Foster parents shall accept and cooperate with arrangements made for the child to have contact (visits, correspondence, etc.) with his biological family with the frequency as indicated by the guardian.

"(*l*) Foster and adoptive parents shall be capable of providing:

"(1) Care, guidance and supervision of the child, including the handling of emergency situations involving the child. All foster and adoptive homes shall have a working telephone with emergency numbers posted in an easily visible location. The department shall be immediately notified of any change in telephone number. The foster or adoptive family shall establish plans to respond to illness and emergencies, including serious injury and ingestion of poison. Any child showing suspicious signs of illness shall be isolated from other children as much as possible and the guardian called immediately. Appropriate first-aid supplies shall be available in the home out of reach of the children. Written permission for emergency health care of the child must be obtained from the guardian. Instructions must be obtained from the child's physician if medications are to be administered by the foster or adoptive parent. Medications must be kept in labeled containers out of reach of children;

"(2) For or arranging necessary routine medical care;

"(3) Adequate opportunities for recreational, cultural and educational activities both within the family and in the community;

"(4) The child with the opportunity for religious training appropriate to the child's religious denomination;

"(5) For the child to attend school regularly;

"(6) Cooperation with the proper authorities in relation to the child's educational needs;

"(7) For the child's physical needs while in the home. These include adequate nutritional meals and snacks prepared in a safe and sanitary manner; readily available drinking water; a balanced schedule of rest, active play, indoor and outdoor activity appropriate to the age of the child in care. Foster and adoptive parents shall establish a planned program of developmentally appropriate activities, especially for children who are multilingual or handicapped, which promotes the social, intellectual, emotional and physical development of each child.

"(8) Assigned work duties to the child on the basis of his age and abilities and establishment of a daily routine to promote good work habits.

"(m) Foster and adoptive parents shall give children humane and affectionate care. They shall establish limits and assist children to develop self-control. Discipline shall be appropriate to the child's age and level of development. Foster and adoptive parents shall not use abusive, neglectful, corporal, humiliating or frightening punishment and restraints not appropriate to the circumstances, particularly in the area of toileting, feeding or sleeping practices.

"(n) Infants shall be allowed to crawl or toddle for a time. They shall be held for all bottle feedings and at other times during the child-care period for attention and verbal communication.

*in all matters pertaining to the child's welfare";* (emphasis added) Regs., Conn. State Agencies § 17a-145-101 (i); to "accept and cooperate with arrangements made for the child to have contacts . . . with his biological family . . . as indicated by the guardian"; Regs., Conn. State Agencies § 17a-145-101 (k); to allow infants "to crawl or toddle for a time" and to hold them "for all bottle feedings and at other times during the child-care period for attention and verbal communication"; Regs., Conn. State Agencies § 17a-145-101 (n); to provide each sleeping room with "two approved means of egress"; Regs., Conn. State Agencies § 17a-145-100 (b); to ensure that "[s]leeping rooms for children shall be used only for sleeping purposes"; Regs., Conn. State Agencies § 17a-145-100 (f); to ensure that "[f]oster . . . children under the age of five shall sleep on the same floor and in close proximity to foster . . . parents . . . or a responsible adult"; Regs., Conn. State Agencies § 17a-145-100 (g); and to provide "[a] separate bed . . . for each child, but siblings of the same sex may sleep together in a double bed with the approval of the commissioner . . . ." Regs., Conn. State Agencies § 17a-145-100 (h).

The department regulations also prohibit foster parents from engaging in certain activities or from arranging living accommodations in certain ways. Thus, foster parents "shall not be employed outside of the home except by agreement with the placing agency"; Regs., Conn. State Agencies § 17a-145-101 (h); "shall not have roomers or boarders without the approval of the commissioner or his designee"; Regs., Conn. State Agencies § 17a-145-101 (j); shall not permit a "child three years

---

"(o) No license shall be granted if, within five years of date of application for license, the provider or anyone regularly residing in the home or any substitute caregiver has been convicted of a felony against persons, is awaiting or is on trial for such charges, or has had a child removed from his care or custody for reason of child abuse or neglect."

or older . . . to share a bedroom with another child of the opposite sex or with any adult person except a child of the foster or adoptive parents" who is of the same sex; Regs., Conn. State Agencies § 17a-145-100 (i); and shall not allow "more than four children, including the foster . . . parents' own children, [to] sleep in the same room." Regs., Conn. State Agencies § 17a-145-100 (j).

Finally, these regulations demand that foster parents "be capable of providing," among other things, "[a]dequate opportunities for recreational, cultural and educational activities both within the family and in the community"; Regs., Conn. State Agencies § 17a-145-101 (*l*) (3); "the opportunity for religious training appropriate to the child's religious denomination"; Regs., Conn. State Agencies § 17a-145-101 (*l*) (4); "a balanced schedule of rest, active play, indoor and outdoor activity appropriate to the age of the child in care"; Regs., Conn. State Agencies § 17a-145-101 (*l*) (7); and "[a]ssigned work duties . . . on the basis of [the child's] age and abilities and . . . a daily routine to promote good work habits." Regs., Conn. State Agencies § 17a-145-101 (*l*) (8). We conclude that, in the aggregate, these regulations embody the state's right to control the day-to-day activities of foster parents and demonstrate that foster parents are not independent contractors.

The state makes two arguments to deemphasize the pervasive right to control manifested by these regulations. It first urges us to conclude, as the trial court found, that despite its regulations, the department has left many "social, emotional, educational, and parental" decisions to the foster parent. We are unpersuaded. The very comprehensiveness of the regulations contradicts this view. See footnote 14. Moreover, the right to control test does not focus on the actual exercise of control. "As previously noted, it is not the actual exercise of the right to control that distinguishes an [employee]

from an independent contractor, but rather the employer's possession of the right to control." *Latimer* v. *Administrator*, supra, 216 Conn. 251. That foster parents are "permitted to perform their day-to-day duties without interference so long as those duties [are] performed in a satisfactory manner does not militate against a conclusion of control." Id.

Furthermore, we disagree with the state's claim that, although the rights of foster parents are limited, foster parents occupy "a status as near to natural parents as possible." The rights of foster parents are defined and restricted by statute. "Foster families do not have the same rights as biological families or adoptive families. Rather, the expectations and entitlements of foster families can be limited by the state. . . ." (Citation omitted). *Nye* v. *Marcus*, 198 Conn. 138, 143, 502 A.2d 869 (1985); see *Eason* v. *Welfare Commissioner*, 171 Conn. 630, 638–39, 370 A.2d 1082 (1976), cert. denied, 432 U.S. 907, 97 S. Ct. 2953, 53 L. Ed. 2d 1079 (1977) (foster parents derive rights from department). Foster parents are entrusted with foster children on a temporary basis only. See *Nye* v. *Marcus*, supra, 144 (recognizing absence of any "justifiable expectation that [the] relationship with [the foster child] would be anything but temporary"). Foster parents do not enjoy a liberty interest in the "integrity of their family unit." Id. They may not intervene in proceedings to terminate the rights of natural parents; *In re Juvenile Appeal (Docket No. 10718)*, 188 Conn. 259, 262–63, 449 A.2d 165 (1982); nor do they automatically have standing to serve as "next friend" of a removed foster child. *Orsi* v. *Senatore*, 230 Conn. 459, 468–69, 645 A.2d 986 (1994).

The restricted rights of foster parents and the impermanence of their relationship with foster children further militate against recognizing in the foster parent placement the type of "social, emotional, educational, and parental relationship" that the state endorses.

Indeed, foster parenting "implies a warning *against* any deep emotional involvement with the child . . . ." (Emphasis added.) J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1979) p. 24; see also *Smith* v. *Organization of Foster Families*, 431 U.S. 816, 861, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977) (Stewart, J., concurring) (under New York foster care laws "any case where the foster parents had assumed the emotional role of the child's natural parents would represent not a triumph of the system . . . but a failure").

The state also contends that the foster parent regulations serve only as licensure requirements and not as affirmative or prohibitory directives. It relies on *Simmons* v. *Robinson*, 305 S.C. 428, 430–31, 409 S.E.2d 381 (1991), for the proposition that "[t]he mere granting of a license or permit to do an act which is not itself unlawful or dangerous . . . does not render" the state liable for injuries incurred in the performance of the act. (Internal quotation marks omitted.)

We decline to follow *Simmons*. First, the mandates contained in the department's regulations applicable to foster parents in this state extend beyond the point of their initial licensing. See, e.g., Regs., Conn. State Agencies §§ 17a-145-100 (h) through (j), 17a-145-101 (b) through (d), (h) through (k), (m) through (n). As an obvious example, foster parents must "comply with the guardian's plan for the child" without regard to when the department implements that plan. Regs., Conn. State Agencies § 17a-145-101 (i). Indeed, the statute that enables the department to issue regulations, § 17a-90 (c),[15] requires only that the commissioner promulgate "such regulations as he may find necessary and proper to assure" the welfare of foster children; it makes no reference at all to "licensure requirements" for foster

---

[15] See footnote 12.

parents. The fact that the regulations themselves contemplate the possibility of license requirements does not persuade us that the regulations have no function other than to describe continued license eligibility. Reading the regulations in their entirety, we conclude that they are not simply licensure requirements, but serve instead to direct the manner in which foster parents care for foster children.

Moreover, even if these regulations were, in some sense, to serve as "licensure requirements," we are disinclined to follow the holding in *Simmons*. The court in that case based its decision on the proposition that "[t]he mere fact that the [South Carolina department of social services] has the right to control and direct foster parents *is not dispositive.*" (Emphasis added.) *Simmons* v. *Robinson,* supra, 305 S.C. 431. In this state, the right to control test *is* dispositive. Thus, our conclusion that the department had the right to control foster parents is determinative of the outcome in this case, regardless of whether the department considers its regulations as only "licensure requirements."

We recognize that the majority of courts in other states that have considered this issue have concluded that foster parents are not employees of the state. See, e.g., *District of Columbia* v. *Hampton,* 666 A.2d 30, 38 (D.C. App. 1995); *Mitzner* v. *State,* 257 Kan. 258, 263, 891 P.2d 435 (1995); *Kern* v. *Steele County,* supra, 322 N.W.2d 189; *Stanley* v. *State Industries, Inc.,* 267 N.J. Super. 167, 172, 630 A.2d 1188 (1993); *New Jersey Property-Liability Ins. Guaranty Assn.* v. *State,* 195 N.J. Super. 4, 16, 477 A.2d 826, cert. denied, 99 N.J. 188, 491 A.2d 691 (1984); *Blanca C.* v. *County of Nassau,* 103 App. Div. 2d 524, 529, 480 N.Y.S.2d 747 (1984), aff'd, 65 N.Y.2d 712, 481 N.E.2d 545, 492 N.Y.S.2d 5 (1985); *Kara B.* v. *Dane County,* 198 Wis. 2d 24, 53, 542 N.W.2d 777 (1995), rev. granted, 546 N.W.2d 468 (1996). We do not find these decisions persuasive. In none of these cases

did the court analyze a statutory scheme vesting in the state the type of open-ended power that is vested in the department. Further, in many of these cases, the operative test on which the courts relied was not the right to control test as it has been formulated in this state.[16] Finally, the out-of-state cases do not address the type of pervasive control over the conduct of foster parents that is manifested by the department's regulations in this case.[17] Under our well established "right to control" test, we conclude that the plaintiffs, in their role as foster parents, were "employees" of the state as that term is used in §§ 4-141, 4-165 and 5-141d.[18]

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion BORDEN, BERDON, NORCOTT, KATZ and PALMER, Js., concurred.

CALLAHAN, J., dissenting. The majority has determined that foster parents are state employees within the

[16] For example, in *Kern* v. *Steele County*, supra, 322 N.W.2d 189, the court applied a five-prong test to determine whether foster parents were employees of the state. In *District of Columbia* v. *Hampton*, supra, 666 A.2d 39–40, the court discussed the right to control test, but then applied an actual control test. Id., 40 (regulations did not "establish that the foster parent is under the *actual* control" of department [emphasis added]). In *Mitzner* v. *State*, supra, 257 Kan. 258, the court failed to test the agency's right to control at all. See also *Kara B.* v. *Dane County*, supra, 198 Wis. 2d 60 (addressing right to control test but not applying it).

[17] The state's concern about the possible consequences, under other circumstances, of a determination that foster parents are employees of the state is premature. See *New Jersey Property-Liability Ins. Guaranty Assn.* v. *State*, supra, 195 N.J. Super. 16. Our decision today fits narrowly within the facts of the present case. We express no view on the state's potential liability for the conduct of foster parents leading to injuries to parties other than foster children.

[18] Our conclusion that the plaintiffs were employees within the meaning of § 4-141 is not sufficient to entitle them to defense or indemnification. In order to qualify for protection under both §§ 4-165 and 5-141d, the plaintiffs must have been acting "within the scope of [their] employment" and their conduct must not have been "wanton, reckless or malicious." See footnote 1. Because the trial court did not reach these issues, we do not address them.

meaning of General Statutes § 5-141d and are therefore entitled to be defended and indemnified for negligent acts performed within the scope of their "employment" as foster parents. I believe that it is a perversion of the term "state employee" as used in General Statutes § 5-141d to include foster parents within its ambit. Therefore, I respectfully dissent.

Both parties agree that this case boils down to a question of legislative intent. The dispositive issue is whether the legislature intended foster parents to be considered state employees who are entitled to defense and indemnification from the state pursuant to General Statutes § 5-141d in common law negligence actions. In the specific context of statutes in derogation of sovereign immunity, "[w]here there is any doubt about [the] meaning or intent [of the statute, it is] given the effect which makes the least rather than the most change in sovereign immunity. . . . [T]he state's sovereign right not to be sued without its consent is not to be diminished by statute, unless a clear intention to that effect on the part of the legislature is disclosed, by the use of express terms . . . ." (Citation omitted; internal quotation marks omitted.) *White* v. *Burns*, 213 Conn. 307, 312–13, 567 A.2d 1195 (1990). I believe that the answer to the question of whether foster parents are properly characterized as state employees is, at best, ambiguous. Because we are bound to construe strictly statutes in derogation of sovereign immunity and to resolve any ambiguities in those statutes in favor of preserving the public fisc, I would conclude that foster parents are not state employees within the penumbra of § 5-141d.

One of the difficulties with the majority's opinion is the way in which it characterizes and addresses the issue, limiting its analysis to determining whether a foster parent is an employee or an independent contractor. "The foster parent's actual status is rather unique

and does not actually fit within either term. A more apt description of a foster parent would be more of an expense-reimbursed volunteer who must be licensed and who operates within certain guidelines." *Mitzner* v. *State*, 257 Kan. 258, 262, 891 P.2d 435 (1995). Rather than attempting to pound a square peg into a round hole by restricting the potential classification of a foster parent to "employee" or "independent contractor," I would determine only whether the legislature intended a foster parent to be a state employee within the meaning of § 5-141d when it enacted the statute. If a foster parent does not clearly fit within the intended meaning of the term "employee" in the statute, the state must prevail under the required strict interpretation of sovereign immunity. *White* v. *Burns*, supra, 213 Conn. 312–13.

If the "right to control" test relied on by the majority is appropriately used to distinguish employees from independent contractors, how well can we expect it to function when we consider foster parents, who fill a role that fits neither category upon which the "right to control" test is premised? In addition to foster parents, what other functionaries who the state licenses and regulates, not generally thought of as employees, might now fit under the heading of state employees?

The right to control of the commissioner of children and families (commissioner) manifests itself predominantly in the licensing requirements and in the regulation of foster parents and their homes. In other words, the right to control exists in the licensing mechanism of the state and in the promulgation of regulations, and not in the day-to-day oversight that traditionally evidences the right to control in employer-employee relations. In the present case, the plaintiffs had numerous specifications with which they had to comply, but how they parented, the means and method of their parenting, was beyond the actual control of the commissioner. While the commissioner may have a right to

control the nuts and bolts of providing for a child's health and safety, in reality the commissioner cannot regulate the true parenting aspects of the foster parent-foster child relationship. In fact, the only reason foster parents exist is to provide the children with something the state itself cannot provide. To say then that the state has a right to control that part of the foster parent function that cannot be performed by the state belittles the subtle and personal nature of parenting.

The ambiguity pertaining to the issue of whether a foster parent is properly characterized as a state employee is highlighted by the decisions of our sister states. As the majority concedes, "the majority of courts in other states that have considered this issue have concluded that foster parents are not employees of the state." Although the majority seeks to distinguish some of these cases, the fact remains that there are several cases that are strikingly similar to the case before us and that reach the opposite result. See *Mitzner* v. *State*, supra, 257 Kan. 263 ("an individual does not become a state employee by becoming a licensed foster parent"); *New Jersey Property-Liability Ins. Guaranty Assn.* v. *State*, 195 N.J. Super. 4, 16, 477 A.2d 826 (1984) (foster parents not state employees for purposes of New Jersey Tort Claims Act); *Kern* v. *Steele County*, 322 N.W.2d 187, 189 (Minn. 1982) (considering five factors, including right to control manner of performance, control of premises and right of discharge, and concluding that foster parents are not state employees).

Another indication that foster parents were not clearly intended to be included within the defense and indemnification provisions of § 5-141d was provided by the legislature when it enacted No. 94-216 of the 1994 Public Acts subsequent to the death of the plaintiffs' foster child. The relevant portion of that public act provides: "A person licensed pursuant to section 17a-114 of the general statutes shall be liable for any act

or omission resulting in personal injury to a child placed in his care by the commissioner of children and families to the same extent as a biological parent is liable for any act or omission resulting in personal injury to a biological child in his care." Representative John Thompson, speaking in support of the public act, stated that its purpose was "[to] provide liability coverage for foster parents at the same level as natural parents when caring for a child placed in their custody." 37 H.R. Proc., Pt. 16, 1994 Sess., p. 5884. When the possibility of making foster parents state employees was raised on the floor of the House of Representatives in 1994, Representative Thompson responded, "I believe that this bill has been endorsed by the Foster Parents Association and I do not believe there has ever been any discussion by them that they would seek employment status with the state. On the contrary, this bill is to protect their interest and allow them to remain private people and I think that is in the best interests of the children. . . . [A]t this point, I know of no interest on the part of the foster parents or on the part of the state to give them that status." Id., p. 5887. The fact that the 1994 legislature, a group presumably familiar with the existing state of the law, articulated its understanding that foster parents were not state employees within the meaning of § 5-141d suggests further that the intent of the legislature concerning whether foster parents are to be treated as state employees is, to say the least, open to question.

In short, I would not find a waiver of the state's sovereign immunity in this case where the meaning of the term "employee" in the context of the statutory scheme waiving sovereign immunity is uncertain at best. I respectfully dissent.