MEMORANDUM OF DECISION
On November 23, 1998, the Department of Children and Families ("DCF" or "petitioner") filed petitions to terminate the parental rights of Deanne H.-D., mother, to her children, Cesar G. ("Cesar"), A/K/A H.-D.; Sierra G. ("Sierra"), Allen H. ("Allen"), and Marion D., Jr. ("Marion"). These petitions also sought to terminate the parental rights of the fathers of these children. Cesar G., Sr. (father of Cesar and Sierra); Jimmy A. (father of Allen); and Marion D., Sr. (or "Mr. D.") (father of Marion). Trial concerning the petitions was held on March 29, 30, and 31, and April 3, 4, and 5, 2000. Seventeen witnesses testified in person, plus one by deposition, and ninety-two exhibits were admitted in evidence. For the reasons stated below, the court grants the petitions.
FACTS
The court finds the following facts and credits the following evidence, except as noted.
A. Background of the Case
Cesar was born on February 22, 1986; Sierra was born on August 7, 1987; Allen was born on September 11, 1988; and Marion was born on February 26, 1992.
On December 5, 1991, orders of temporary custody were granted concerning Cesar, Sierra, and Allen. The precipitating event was the hospitalization and death of their sister, Regina H. (D.O.B. October 7, 1989) on December 3, 1991, two days before. Her death was referred to as a homicide by the medical examiner (see infra, the Life and Death of Regina, at 16). On April 2, 1992, a little over one month after he was born, the court issued an OTC concerning Marion. On December 17, 1992, by agreement, and after a nolo contendere plea by the mother and an admission by Marion D., Sr., the four children were adjudicated as neglected. On June 16, 1993, all four children were committed to the care and custody of DCF as neglected children. Subsequently, their commitments were extended.
In October, 1996, a motion for revocation of commitment was filed by CT Page 5574 mother and the attorney for the three oldest children; this was followed by DCF's motion for out-of-state placement. seeking to place the children with Mr. and Mrs. O., the latter being mother's twin sister. Trial on these two motions occurred before the court (Teller, J.) over seven days in February, 1997; April, 1997; May, 1997; and August, 1997. Judge Teller rendered a written Memorandum of Decision. dated November 5, 1997, denying the revocation motion and authorizing the out-of-state placement. In response to mother's appeal, the Appellate Court affirmed Judge Teller's decision in In re Cesar G., 56 Conn. App. 289 (2000).
On June 9, 1998, the court (Keller, J.) extended the children's commitments and found that DCF had made reasonable efforts toward reunification and that continued efforts toward reunification were no longer appropriate, except for visitation arranged by DCF pursuant to therapist recommendations. On May 26, 1999, the court (Dyer, J.), after a contested extension hearing, extended the children's commitments until June 16, 2000 and noted Judge Keller's prior finding that further efforts at reunification were inappropriate, which was not disturbed.
Deanne H.-D., Marion D., Sr., and Cesar G., Sr. attended trial and were represented by counsel. Jimmy A. (father of Allen) was served with the petition concerning Allen by publication on December 2, 1998. This was confirmed by the court (Keller, J.) on December 22, 1998 and he was defaulted for failure to appear on that date. He did not appear at trial.
On March 31, 2000, in the midst of the presentation of petitioner's case, and after hearing Mrs. O., the children's aunt, testify, Cesar G., Sr. presented his consent to the termination of his parental rights as to Cesar and Sierra. After canvassing him, the court accepted his consent. He and his counsel were then excused from further attendance.
B. The Mother
Deanne H.-D. was born in 1969. She had her first child at age fourteen. This child, Julie. died from meningitis at age one and a half years. In 1984, she had her second child. Cleo. Her five other children were born subsequently, as noted above. As of the date of the petitions, two were deceased and the other five were not in her care.
Mother was evaluated by a Child and Family Services (now the "Village") clinician in July, 1992. Exh. 22. She was seen as "severely mistrustful of the medical/social service delivery systems." The assessment concluded:
 Her parenting skills are very likely poor, and her methods of discipline punitive/abusive. Her CT Page 5575 self-esteem is low, and it seems she protects herself by shutting down, emotionally, pushing people away and not trust helping professionals. Underneath her hard exterior seems to be a frightened, shamed, grieving, young woman who feels disempowered and at mercy of the system.
Id. at 2-3.
On the criminal charges against her resulting from Regina's death, Deanne H.-D. was found guilty of cruelty to persons, in violation of Conn. Gen. Stat. § 53-20, a misdemeanor. She was acquitted of manslaughter and risk of injury to a child. She was sentenced to one year of incarceration, execution suspended, and placed on probation. Exh. 31. Special conditions of probation included anger control counseling, and psychological/psychiatric treatment screening and counseling. Id.
In 1992, mother married Marion D., Sr. She had not married previously. She has been steadily employed in recent years.
C. Marion D., Sr., father of Marion
Mr. D. was born in 1966 in South Carolina and graduated from high school in 1986. He moved to Connecticut in 1988. He has been employed since his arrival. He married Deanne H.-D. in January, 1992, just one month after the death of her daughter, Regina. They had dated for two years before their marriage.
D. Jimmy A., father of Allen
Jimmy A. has been whereabouts unknown since the inception of his child's case being opened by DCF in 1991. DCF made a diligent search for him but was unable to obtain information about him.
E. Cleo and Her Care
Mother's history concerning her daughter Cleo and Cleo's eating disorder is instructive. Cleo was born on December 24, 1984, a little over a month after her sister, Julie (D.O.B. March 12, 1983) died on November 15, 1984, from meningitis.
Cleo was diagnosed as a failure to thrive child. Hartford Hospital Discharge Summary, Exh. 2. She entered Hartford Hospital on March 23, 1987, after D.C.Y.S. (DCF's predecessor) involvement with the family began, at the age of two years and three months. CT Page 5576
At the time Cleo began to be cared for at Hartford Hospital, Cleo weighed 19 pounds, 13 ounces, which is "less than the 5th
percentile . . ." Id. at 1. Cleo's history, as provided by Deanne H.-D. at the hospital, was noted to be "rather vague and inconsistent. . . ." Exh. 2a at 1. It was observed that mother "appears reluctant to comfort child." Id. at 2.
Once in the hospital, Cleo steadily gained weight. Id. at 3. Hospital staff observed that Cleo ate better when nurses fed her than when her mother did so. Id. Mother yelled at and berated Cleo concerning her eating. Id. An eating disorder was diagnosed and it was recommended that mother enroll Cleo in the out-patient Eating Disorders Program at Newington Children's Hospital. Id. Since mother agreed to this plan, Cleo was discharged home with D.C.Y.S. (now DCF) monitoring. Letter from J. Tibbetts, dated May 28, 1987, at 2 (part of Exh. 59). Mother canceled the initial appointment and scheduled no follow-up. Exh. 2a at 3.
During the stay at Hartford Hospital, mother was observed to be openly hostile to the hospital's social worker. Id. Many instances of inappropriate behavior between mother and Cleo were observed. For example, she asked staff whether there was a garbage chute available so she could throw Cleo down it. Exh. 3. Her lack of patience with Cleo was interfering "greatly with her ability to deal with Cleo's eating problem. "Exh. 2a at 4. During that hospitalization, mother threatened to remove Cleo against medical advice. Exh. 34 at 33. Cleo left the hospital on April 10, 1987.
Subsequently, in July, 1987, Cleo's physician at Hartford Hospital wrote to D.C.Y.S. expressing his concern that Cleo was not being brought to her scheduled appointments. He stated that, without intervention, her growth and development were at "grave risk." Exh. 2b. Mother also refused the services of a VNA homemaker. Exh. 4. Ms. Tibbetts, a nurse, wrote to D.C.Y.S. of mother's "cavalier, uncaring attitude toward her children and their well-being. . . ." Id.
After a neglect petition concerning Cleo was filed with the Superior Court in July, 1987 (Exh. 5), a Social Study (Exh. 6) reflected concerns related by Cesar G. Sr.'s family about physical violence by mother towards Cleo: "Mother was said to have no control over her anger, to be physically abusive. Reportedly, she had slammed her 2 year old daughter against the wall. Reportedly, she was stating she'd kill herself or her baby." Id. at 2. Mother refused to allow D.C.Y.S. into her home. Id. at 4. Later in 1987, Cleo's legal guardianship was transferred to Deanne H.- D.'s mother through the Probate Court.
At the 1997 trial, mother denied that she had problems feeding Cleo. CT Page 5577 Exh. 34 at 31. She admitted that Cleo had been diagnosed as a failure to thrive child and was hospitalized for that condition.
F. The Life and Death of Regina
1. Before The Incident of November 30, 1991 ("the incident")
During Regina's life, Deanne H.-D. was not her sole parent. Exh. 33 at 37. For about one-half of Regina's life she lived with her godmother. Id. at 37-38. She went back and forth as her godmother helped mother, who was a single parent. Id. at 38. It was planned, during this period, that the godmother would adopt Regina. Exh. 57 (St. Francis Hospital and Medical Center ("St. Francis") Progress Notes, dated 11/28/90).
Police interviewed the godmother, Ms. S., shortly after the incident. Regina was in good health in her care. She was spirited, outgoing and playful during the months she cared for Regina. As Ms. S' relationship with Deanne H.-D. began to deteriorate, Regina was returned to her mother on February 4, 1991. According to Ms. S., when she saw Regina briefly a month later, Regina appeared withdrawn, like a "zombie." Exh. 7 (Arrest Warrant Application at 6-7 of 7).
Regina was hospitalized twice before the incident leading to her death. In July, 1990, when she was nine months old, she spent five days at St. Francis after incurring a high fever, which abated. Exh. 57 (Discharge Summary, dated May 10, 1991). It was noted that her past medical history included an early diagnosis of sickle cell disease.
In December, 1990, she again went to St. Francis for a four day stay with a high fever. Again the fever abated and she was discharged. Exh. 57 (Discharge Summary, dated January 2, 1991). It was noted at a follow-up visit that Regina had been able to maintain her weight while in the hospital. Exh. 57 (Progress Note, dated December 19, 1990).
In August, 1991, test results showed that Regina did not have sickle cell disease, but had sickle cell trait. Exh. 57 (Progress Notes, dated 8/21/91). Mother acknowledged that originally Regina was diagnosed as having sickle cell anemia. Exh. 34 at 104. Dr. Fisher (see infra at 11) explained that persons who have sickle cell trait do not suffer medical problems as a result.
Regina's weight sharply declined in her mother's care. On November 28, 1990, at St. Francis, she weighed nineteen pounds and thirteen ounces, which placed her in the one-tenth percentile of weight for her height. Exh. 57 (Progress Notes, dated 11/28/90). Dietary issues were noted and suggestions made. Id. At death, one year later, she weighed only CT Page 5578 eighteen pounds. Exh. 10.
Regina was living with mother at the time of the incident which led to her death. Exh. 33 at 38. Although Marion D., Sr. was involved in mother's life then, he was not involved in caring for the children at that time. Id. at 85.
Regina died at Hartford Hospital on December 3, 1991. Her grandmother (Deanne H.-D.'s mother) Willie H., saw Regina and her siblings on November 29, 1991, when Regina and the other children seemed fine. Exh. 7 (Hartford Police Department Arrest Warrant Application, p. 3 of 7); Exh. 8 (affidavit of Jeanne H. Berg, D.C.Y.S. after hours social worker, par. 21).
On the evening of the next day, November 30, 1991,[2] Deanne H.-D. called her mother to tell her that Regina had fallen off the toilet and was not breathing. Willie H. advised her to call 911 and to take the children to the hospital. Id. at 3 of 7-3 of 8; Exh. 8, pars. 19-20. In her testimony, Deanne H.-D. did not mention calling her mother before calling for an ambulance. For "a day or two," before the day of the incident, Regina had not been eating. Exh. 34 at 80.
2. Mother's Testimony Concerning the Events
There are significant discrepancies between mother's testimony and her and Marion D. Sr.'s earlier versions of events, as well as her other children's statements in 1991. The following is mother's account, according to her testimony. The court does not credit this account. It is set forth to illustrate how her earlier statements differed. See infra at 11. According to mother, on the day of the incident, Regina refused to eat breakfast. Exh. 34 at 66.[3] Then, she would not eat lunch. Id. Mother became frustrated after trying to talk her into eating. She drank what was given to her, but would not eat. She put some food in her mouth but would not swallow. Mother yelled at her. Id. She would not eat the popcorn which mother provided to the children after lunch. Id.
Regina took a long nap in the afternoon. Mother woke her. Regina said she wanted something to eat and mother gave her a bologna and cheese sandwich. She took a bite, but then would not eat. She drank some chocolate milk. But, although mother tried to get her to eat the sandwich, she would not. Id.
At that point, mother "whooped her with the belt." Id. at 67. She spit out the piece of sandwich in mother's hand and then said she had to go the bathroom. Mother walked her into the bathroom and sat her on the toilet. Regina sat there "a long time and she wouldn't do anything." Id. CT Page 5579 Then, allegedly, her eyes started "to look funny and they just got really big and watery." Id. at 68. She and Regina talked normally. Id.
Mother stated she went back to the kitchen to get something out of the freezer and "heard a thump." The bathroom was connected to the kitchen. Mother returned to the bathroom, where Regina was laying on the floor. Mother stated she "grabbed her up and started shaking her, and started talking to her. She wouldn't respond at that time. Mr. [D] came into the house and, I, you know, gave her to him and I ran downstairs to call the ambulance." Id. at 68.
According to mother, when she turned back to Regina after hearing the thump. Regina was lying on her face. Id. Although there was a bathtub next to the toilet, if Regina had fallen forward she would not have hit it. Id. at 69.
At the 1997 trial, mother admitted that, on that day, she struck Regina with a belt because she was not eating. Exh. 34 at 62. She testified that that was the only time she hit Regina and that she did not hit her before that. Id.
Mother's version of a "one time only" beating of Regina was contradicted by Sierra and Cesar. On December 2, 1991, they were interviewed by Ms. Hatcher, a D.C.Y.S. social worker. According to them, whipping with a hard belt was a common method of punishment. Exh. 7 (Arrest Warrant Application, at 5 of 7).
At the 1997 trial, when confronted with Dr. Fisher's December, 1991 affidavit (Exh. 9), in which he stated that he found bruises on Regina's body in different stages of healing, which would indicate there was more than one incident of beating, see infra at 13, mother was asked if she wished to change her previous testimony that there was only one incident of beating. In response, she stated she did not wish to do so. Id. at 63. This same line of questioning was repeated at the year 2000 trial. After she heard Dr. Fisher testify to the same effect, her response was that some of what Dr. Fisher said is inaccurate. She then admitted to "whooping" Regina twice, once several weeks before when Regina drank water from the toilet, and once at the time of the incident. Her inconsistent testimony is viewed by the court as evidence of her lack of credibility.
Mother agreed that both Sierra and Cesar witnessed some of what happened on the day Regina went to the hospital. Exh. 34 at 61. She acknowledged that this was a traumatizing experience for them.
Mother's explanation of her child's serious head injury was that "more CT Page 5580 than likely it happened during her fall." Exh. 34 at 64. While she claims she did not witness this alleged fail, she stated she "heard a thump" and then found Regina on the floor. Id. In view of her lack of credibility and of the medical findings discussed below, the court does not credit her recitation of events.
When asked at the 1997 trial what she felt she did to cause Regina's death, mother said. "I know that I could have like called the ambulance sooner or something, had I just really paid attention to how she was responding." Exh. 34 at 80.
3. Mother Statements At The Time of The Incident
At Hartford Hospital, Regina was examined and treated by Daniel G. Fisher, M.D. Dr. Fisher is a member of the Division of Critical Care, Department of Pediatrics, at the Connecticut Children's Medical Center in Hartford. There, he is a Staff Intensivist in the Pediatric Intensive Care Unit. Exh. 60 (Curriculum Vitae). He is board certified by the American Board of Pediatrics and its sub-Board of Pediatric Critical Care. Id. Dr. Fisher testified at the year 2000 trial as an expert witness. Regina's was one of almost twenty child fatalities he has examined.
The court does not accept mother's later testimony that she beat Regina only once or twice. On November 30, 1991, at Hartford Hospital, she told Dr. Fisher that she had to beat Regina once per month "when she is acting bad." Exh. 58 (Hartford Hospital Progress Notes, 11/30/91, at 23:55). "Acting bad" involved not eating well. Exh. 9, par. IV.
Also, when giving the history to Dr. Fisher in 1991, she told him that Regina lived with her godmother from age two months to age ten months. She stated that Regina had sickle cell trait. (Exh. 58, Progress Notes). Nothing was related to Dr. Fisher regarding Cleo's eating disorder, or her previous diagnosis, at the very same hospital, of failure to thrive. If she had told Dr. Fisher about this, he would have noted it.
Dr. Fisher reviewed Exhibits 2a, 2b, 3, and 4, concerning Cleo (see discussion, supra, at 5-6) and discussed them at trial. To him, they reflected failure to thrive, a feeding problem, as well as mother's hostile and belligerent attitude. He found them extremely relevant to mother's parenting abilities and to evidence harsh treatment of a child. Cleo's history adds weight to Dr. Fisher's diagnosis of abuse and neglect of Regina. The treatment of Cleo was a marker for potential abuse of other children.
On the day of the incident, Regina was in her mother's care for the CT Page 5581 entire day. Dr. Fisher's December 4, 1991 affidavit (Exh. 9) provides other details concerning the events of November 30, 1991, related to him as Regina's treating physician by mother. According to mother. Regina ate only one or two bites of a sandwich. Supposedly, according to what she told Dr. Fisher, when mother heard the loud noise and returned to find Regina lying face down, Regina uttered a loud, piercing scream and then became limp. Id., par. II.
According to mother, at this time, Regina's eyes were unfocused, and she only responded to questions with "uh-huh." Then she made snoring sounds and was unresponsive to shaking. Marion D., Sr. arrived and took Regina out onto the porch into the cold air, but got no response. Id. Mr. D. related to Dr. Fisher that when he came to the house, Regina was limp. Id.[4]
An ambulance was called at 5:16 p.m. and arrived promptly. Exh. 7 (Hartford Police Dept. Incident Reports, 11/30/91, at 3 of 3). As Dr. Fisher noted, when emergency medical personnel examined Regina, she was in an extreme state of respiratory distress and coma. It was very unusual for parents to let a child be that way for a period of time.
From the history, it was apparent that Regina had an impaired arousal/awareness condition for a period of time before medical attention was sought. When a child is gasping and unresponsive. most people would know that a severe condition was evidenced. Dr. Fisher saw this as part of classic child abuse: an individual delays seeking medical attention because of the possibility of the discovery of her actions. In his view, mother may have waited as much as an hour or two before calling for an ambulance.
4. Dr. Fisher's Examination and Conclusions
When Dr. Fisher examined Regina at the time of her admission on November 30, 1991 he found:
 Regina had one u-shaped mark in the abdominal region below the left rib cage. This mark was approximately 2 cm wide and 4 cm long. There were seven similar u-shaped marks on the right lateral thigh. The mark on her abdomen is purple in color; and three upper marks on the left thigh are also this purple color. The other four marks, on the lower thigh, are less purple and more faded in color.
Exh. 9, par. III. CT Page 5582
Initially, Dr. Fisher found that the history related by Deanne H.-D. and Marion D., Sr. to be inconsistent with Regina's physical presentation. At the time he wrote his affidavit, in December, 1991, he stated that the cause of her respiratory arrest was unknown, but that "intentional injury must be entertained." Id. par. V.
Further, he stated that the injuries he found on her thigh and abdomen were the result of excessive corporal punishment and were consistent with abuse. Id. at VI. He found that "the higher marks are fresher than the lower thigh marks. This is evidence of two separate episodes of infliction meaning a pattern of excessive punishment." Id. These were classic marks of looped cord whippings.
By December 2, 1991, Regina was listed as brain dead. She died the next day.
Dr. Fisher reviewed Exh. 10, the post-mortem report, just before trial in March, 2000. The hematoma found in the autopsy had not been discovered when Regina was in his care in 1991 since the injury could not be discovered upon external examination. A lump would not necessarily result from such an injury. He noted that Exh. 10 shows that Regina suffered cerebral edema (brain swelling). This was a response to the head injury she received.
Due to its location on Regina's head, Regina's head injury, as revealed in the autopsy, was not consistent with what Deanne H.-D. had told him in 1991. Regina could not have received the injury to the back of her head by falling face down after sitting on a toilet, as mother described. A child who fell forward on her face would have received trauma to her face.
He explained that the lack of history of cardiac arrest or explanation of her coma was inconsistent with Regina's presentation at the hospital. Children do not spontaneously go into such arrest or coma. Intentional injury is now the only explanation. The hematoma, a deep bruise, which she suffered to her head, was caused by a significant amount of force. Regina suffered classic physical abuse.
That hematoma rendered her unconscious, leading to a failure to breathe adequately, leading further to cardiac arrest, additional damage to her brain, and death. The injury suffered was very serious.
Previous to the head injury, Regina was in no distress and had apparently normal neurological functioning. Malnutrition made her thin, but did not impair her brain, lungs, or heart. Dr. Fisher and Dr. Gilchrist (see below) expressed their findings somewhat differently. CT Page 5583 After reviewing Exh. 10, the post-mortem report. Dr. Fisher said he would have worded the conclusion differently. He would have said that death resulted from blunt trauma, with malnutrition listed as a secondary cause. Both experts agree that a blunt trauma occurred.
5. Dr. Gilchrist's Examination and Conclusions
Thomas F. Gilchrist, M.D., Associate Medical Examiner for the State of Connecticut, conducted an autopsy of Regina's body on December 4, 1991, the day after she died. In the course of that examination, he took several photographs of her, which became Exhs. 11-15. He testified at trial as an expert witness.[5]
Dr. Gilchrist has practiced pathology since 1970. He has held numerous academic positions in the field. Currently, he is also an assistant professor of clinical pathology at the University of Connecticut. Exh. 16 (curriculum vitae).
He concluded that Regina's death was the result of a homicide. Exh. 10 at 6. She had suffered a blunt trauma to the top, rear of her head, as depicted on diagrams which are part of his report, resulting in a subgaleal hematoma (deep bruise). He believes also that Regina suffered from malnutrition, a chronic illness which made her more susceptible to the blunt trauma. When she died. Regina weighed eighteen pounds. Exh. 10 at 1.
Using Exh. 12, a photograph of the interior of Regina's head taken during the autopsy, after reflecting her scalp, he explained that the head injury was not visible externally. He stated that the injury was caused by a single blunt trauma, of significant force, due to a blow or fall. While the injury could have been caused by a fall resulting in an injury to the back of the head, it was inconsistent with the history given to Dr. Fisher, as stated in his December 4, 1991 affidavit, Exh. 9. If the child had fallen forward as mother claimed, the injury would have been in the front of the head. Thus, mother's explanation of events did not ring true. In his opinion, Regina was abused.
At the current trial, mother acknowledged that she had abused Regina and that she should not have "whooped" Regina. She once again did not acknowledge causing the injury which led to her child's death.
G. The Children And Their Progress In Foster Care
The children each have had several placements during their time in foster care. Sierra has had five placements, although one lasted almost six years. Cesar also has lived in with five caretakers; one lasted over CT Page 5584 four years. Allen, too, has had five. Marion has had nine, the most by far. Exh. 62. After extensive visiting, studying, and transition planning, all four were placed with their maternal aunt, Mrs. O. (mother's fraternal twin sister), and her husband in April, 1998, in Massachusetts.
Amaryllis Stevens-Castro described the children. She was deposed pursuant to court order. on September 22, 1999, in advance of trial, since she was moving out-of-state and would be unavailable to testify at trial. She was employed at the Village for Families and Children ("Village") in Hartford (formerly known as Child and Family Services) for seven years. She has an M.S.W. in social work, and was employed as a social worker, therapist, and case manager. Exh. 49. deposition transcript, at 8-9.
In 1992, she became the therapist for the three oldest children (Cesar, Sierra, and Allen); subsequently she became Marion's therapist as well. Id. at 10-11. The children needed specially-trained foster parents. Id. at 12.
Ms. Stevens-Castro provided weekly, one-hour therapy for the children until 1998 when she closed the case since the children were placed out of state with their aunt. Id. at 13-14. She saw them twice a week, for individual therapy and also at supervised visits, and at visits to their foster homes. Id. at 31.
Dionne O., the children's aunt, also testified. Since April, 1998, when they were placed with her, she has cared for the children with her husband, Mr. O. She expressed her wish to adopt all four children. She is a fourth-grade public school teacher. She expressed her affection for and commitment to the children and her intention to care for them "until they get out of college." They call her and her husband "Auntie" and "Uncle." She consults with the children's current therapist. Mr. Beck. See, infra, at 46.
After the children speak with an attorney or social worker they react. Cesar becomes difficult to manage, Sierra becomes verbally aggressive, and Allen becomes very quiet. This subsides over time.
1. ALLEN
In 1992, soon after placement, Allen was evaluated as an anxious, tense, confused child with a somber, constricted affect. Educational delays were noted and an alternative education program was recommended. He was placed in a specialized foster home. Behavioral problems, such as hoarding and being an instigator were also observed. CT Page 5585
Allen went to a special school in West Hartford, termed the "IEP" (intensive education program). Exh. 49 at 15. He needed a small, contained classroom setting.
Allen's therapy dealt with learning to deal with his aggressive behavior and lack of a father figure. Id. at 39-40. Mother had trouble interacting with him; mostly she interacted with Cesar and Marion, who were more demanding. Id. at 42.
In early 1998, it was observed that his behavior at school was deteriorating, to the point of engaging in threatening behavior. On the positive side, he had made strides in reading and mathematics.
Allen continues to deal with an attention deficit disorder. Periodically his medication for this condition is readjusted to help him stay on track. He continues to have behavioral problems in school and gets special help in reading and math.
2. CESAR
Early on, Cesar had significant difficulties in school and required a special education setting. He was placed in a specialized foster home in 1992.
In September, 1996, Cesar was placed at the Connecticut Children's Medical Center School due to severe emotional and behavioral difficulties (oppositionality, distractibility, physical aggression) which were interfering with his educational progress. He received individual and group therapy at the school. There, he progressed academically. His rigidly idealized view of his mother was observed.
Cesar was very fragile emotionally. Exh. 49 at 44. He, too, had anger control problems. Id. at 58. He had a close relationship with his mother. Id. His therapy revolved around trying to I understand why he was not with his mother. He stated that he saw his mother hit his sister (Regina) and that she went to the hospital. Id. at 45. He had moved from one foster home to another, but was happy to go to live with his aunt. He did not express to Ms. Stevens-Castro that he wanted to live with his mother. Id. at 47.
When he moved in with Mrs. O., Cesar was very insecure. Mrs. O. has found it easy to work with him. Currently he is in the seventh grade and getting special needs help in reading and mathematics. Cesar has told Mrs. O. that, while he does not wish to be adopted, he would like to stay with Mr. and Mrs. O. CT Page 5586
3. SIERRA
Sierra's early oppositional and aggressive tendencies were identified in 1992, soon after placement. An alternative educational program was recommended to meet her needs. She, too, was placed in a specialized foster home.
Sierra's presenting issues in therapy involved aggressive and oppositional behavior. Exh. 49 at 49. She was very angry with her mother. Id. at 51. Primarily, this concerned her mother's hostility toward Sierra's father, Cesar G., Sr. Deanne H.-D. would not hear this concern. Id. at 53. Sierra stated that she did not want to visit with her mother. Id. at 55. She expressed her fear of her mother. Id. at 68. She spoke of nightmares where she would see herself sitting in a lake with Regina and her mother would be hitting Regina and her. She spoke of her mother hitting Regina because Regina would not eat. Id. at 88.
Sierra also went to the CCMC (Connecticut Children's Medical Center) school, which deals with children with behavioral problems and emotional needs; she and Cesar participated in a therapeutic component there. Exh. 49 at 16. Her anxiety and confusion around issues related to her family and placement were observed at the school, as well as underlying apprehension concerning the future.
Mrs. O. noted that Sierra remains very outspoken. She made a big adjustment in the transition to her new home. She has calmed down, but still has an attention deficit disorder. She is seen by a psychopharmacologist to monitor her medication. She is currently in the sixth grade.
4. MARION
After placement, Marion was noted to have speech and language delays. He was frequently described as a very aggressive child, whose behavior interfered with his learning. At school, he was suspended for aggressive physical behavior. Clearly, he needed a self-contained, therapeutic program. Even within such a setting, his behavior would, at times, be out of control.
Frequently, he would strike his siblings. Exh. 49 at 74. He made little progress in therapy. Id. at 32. He was placed in various foster homes. He has been diagnosed as having an attention deficit hyperactivity disorder (ADHD). Id. at 73.
Mrs. O. reported that he has adjusted well to his new surroundings. CT Page 5587 Marion is in a laboratory class with four other students. He has a lot of difficulty with behavior, even on medication.
H. Reunification and Rehabilitation
DCF offered weekly therapeutic visitation at the Village and at DCF, individual counseling, psychiatric evaluation, and case management services to both parents. Visitation was suspended in March, 1998 after the incident described below at 27-28.
The court proceedings and the court's expectations apprised mother and Mr. D. of what the issues were which needed to be addressed, including, primarily, disciplinary practices, parenting skills, and anger management. At the time of the children's neglect commitment, on June 16, 1993, the agreement of the parties concerning the Court's expectations was stated for the record by the court (Goldstein, J.). Exh. 24. Supervised visitation at Child and Family Services (n/k/a The Village) for mother was to be considered, depending on the views of the children's therapist. Id. at 2.
Mother was to continue in counseling and Marion D., Sr. was "to participate as appropriate or needed." Id. Counseling in parenting was to be "individual." Id. Parenting classes could be under the auspices of the Prison Association. Id. at 9.
The written Expectations signed by the court on that date included: (1) keep all appointments set by or with D.C.Y.S and keep whereabouts known to D.C.Y.S and your attorney; (2) visit the children as often as D.C.Y.S permitted; (3) participate in parenting and individual counseling; (4) cooperate with children's therapy and follow recommendations; (5) secure/maintain adequate housing and income; (6) no substance abuse; (7) no involvement with criminal justice system. Exhs. 51 and 52.
Beverly Rice, a DCF social worker, was assigned to the case in February, 1993; in January, 1994 she transferred it to Sara Thompson. While she had the file, Child and Family Services (now the Village) was primarily assigned to manage the case. The Village selected foster homes for the children. Betty Al-Sagaf of the Village served as mother's therapist; Amarylis Castro was the children's therapist.
In September, 1993, the therapists agreed that visits between mother and the children should commence. Written expectations concerning these visits were established in October, 1993. Exh. 50. Included were that mother needed to "convey to the children either a neutral stance about social workers and foster parents, or a positive one to encourage them to trust foster parents and social worker[s]." Id. par. 2. The goal, in CT Page 5588 view of the children's placement adjustment problems, was to stabilize the children and to pull their therapy and mother's together in a joint therapeutic setting. Mother's therapy was to focus around anger control and parenting skills.
Supervised visits at the Village began in November, 1993. In addition to visits at The Village, holiday visits were provided for mother at DCF's office. Mother also had a period of visitation prior to her arrest. Mother testified that the services she and the children received at The Village were beneficial and she felt comfortable with them. Exh. 34 at 101. According to her, The Village implemented a reunification program for her and the children after her criminal case was resolved. Id. at 106. Deanne H.-D., stated that she appreciated everything Ms. Stevens-Castro did for her children. Exh. 33 at 29. Mother acknowledged that she trusted Ms. Stevens-Castro. Id. at 91.
In December, 1993 Mr. Rice recorded an entry in DCF's records (G.A.L. Exh. A) concerning problems at the visitation sessions. Mother was ignoring both therapists. She was back to her "old ways," meaning the rude way she acted prior to the written expectations (Exh. 50). Ms. Rice noted also that Cesar G., Sr. was advised by mother that his children had moved out of state. when this was untrue.
Mother's compliance with the court expectations may be summarized as follows.
Cooperation With DCF
Mother did not keep appointments set by or with DCF, primarily by failing to attend administrative case reviews concerning plans for the children, which were held every six months. After May 2, 1995, she attended none.
Deanne H.-D. was uncooperative with the DCF social workers assigned to the family. For example, in 1995 when Sharon Walters received the case, she was met with rudeness and hostility when she attempted to introduce herself and at subsequent contacts. When she observed visits, she was treated by mother as if she was not there.
Mother also stated that she would not speak to three of DCF's social workers during supervised visits with the children; she would not respond. Exh. 33 at 127. In looking back on that behavior, she admitted that this method of behavior was not a civil, courteous manner with which to treat another human being. Id. It certainly set a poor example for the children. CT Page 5589
In her trial testimony, mother acknowledged that her behavior was wrong. She had failed to present a positive role model for her children.
At trial, Deanne H.-D. acknowledged that she agreed that DCF's original interventions, in the fall of 1991 and spring of 1992, were justified. She agreed that the children (except Marion, who had not been born yet) were traumatized by the beating, hospitalization, and subsequent death of Regina. Sierra. in particular, began acting out. Later. Sierra communicated to her mother her fears and nightmares.
Mother claimed that she had benefitted [benefited] from counseling and learned about appropriate discipline. Ms. Stevens-Castro worked with Deanne H.-D.'s social worker at the Village. Ms. Al-Sagaf, who served as mother's therapist until she retired and was replaced by Dorian Long. Exh. 49, at 17. Ms. Stevens-Castro and the others provided family therapy. Id. at 18. They worked together to help the mother understand the children's behavior. Id.
Visitation
Weekly visits to the children at the Village were therapeutic and supervised.[6] Id. The social workers were always there. Id. Since Ms. Stevens-Castro never felt the mother progressed to where she could handle the four children, unsupervised visits were not provided. Id. at 19. Mother refused to see the children separately or in groups of two. Mother had little patience for the children. Id. Ms. Stevens-Castro relayed her concerns to Ms. Al-Sagaf for communication to the mother. Id. At certain visits, mother would "lose it." Id. at 19-20. Her anger would progress to screaming and yelling, and aggressive and threatening behavior. Id. at 20. No improvement occurred. Id. Deanne H.-D. would not permit the Village personnel to intervene when she was with the children. Id. at 63.
Over the course of time, Ms. Stevens-Castro thought the format of the visits should be changed. Id. at 77. Mother controlled the visits; the social workers were not allowed to talk to the children much during them. Id. at 78. She refused to even let the social workers offer opinions concerning her disciplining of the children. Id. at 87. Mother was not able to establish and maintain a good relationship with her children's therapist. Id. at 82. Mother threatened Ms. Stevens-Castro verbally at almost every visit, until she made no suggestions to the mother. Id. at 90.
As a result of assaultive behavior at these visits. DCF had to be notified. Id. In March, 1994, mother engaged in inappropriate discipline at a supervised visit, in the social workers' presence. Mother yelled CT Page 5590 and screamed. Id. at 62. After Cesar had been jumping up and down on chairs and was walking by his mother, she slapped him hard enough to make him cry. Id. at 23, 57. At the time, Cesar was a small, skinny, fragile child. Id. at 57.
This incident was a subject of the trial heard by Judge Teller in 1997.See, In Re Cesar G., 56 Conn. App. 289, 295 (2000). Ms. Stevens-Castro testified about it at that trial. Exh. 49 at 24. Both Deanne H.-D. and Marion D. Sr. were present to hear this testimony at the 1997 trial. Exh. 49 at 24, 28-29. At that trial, mother admitted hitting Cesar during the supervised visit. Exh. 34 at 121. This occurred while she was in counseling with Ms. Al-Sagaf. Id. at 122. That trial concluded on August 20, 1997; Judge Teller's decision was rendered on November 5, 1997.
This March, 1994 incident was referred to in Judge Teller's Memorandum of Decision, at 9. Judge Teller found that the causes for commitment remained and these were specified as "mother's anger, and her inability to control it, and her inability to adequately and safely parent these children, even with the full time assistance of her husband D., if it were available, which it is not." Id. at 16.
Indeed, at that trial, mother claimed that she had learned through therapy that "no matter what I'm going through I still need to be patient with my children." Exh. 34 at 70. She also claimed that she had learned how to better communicate with them, id. at 70, and that she had learned how to control her own anger. Id. at 72. Supposedly, she had learned to "stop and think" about what she was doing before she did it. Id. at 73. She claimed also to have learned how to separate the children through "time outs" and had implemented this method at the supervised visits. Exh. 33 at 31. Ostensibly, she viewed corporal punishment as "not necessary." Id. at 32. Again, this testimony cannot be credited.
Mother and Marion D., Sr.'s continued failures to recognize and address these significant issues were demonstrated starkly when yet another incident occurred at another supervised visit observed by Ms. Stevens-Castro in February, 1998, only three months after the court's 1997 decision was rendered. Allen and Marion were fighting and were told to stop; Marion, then about to turn age six, ignored his mother.
Ms. Stevens-Castro described that every time Marion proceeded to get up, mother would slam him down and throw him to the floor. At one point, she slapped him. Exh. 49 at 27. He again got up; then, his father, Marion D., Sr., pushed him back and slammed him against a cabinet door. Marion received a scrape on his left shoulder. Id. at 28. He was crying and holding his shoulder. Id. at 66. Ms. Long and Ms. Stevens-Castro were present. Id. at 27. The incident happened so fast that they could CT Page 5591 not intervene. Id. at 65.
The visit was terminated. Id. DCF was contacted and a Form 136 written notification of the incident to DCF was prepared. Exh. 2 to Exh. 49. Visits were suspended and then terminated after Ms. Long and Ms. Stevens- Castro agreed that the children's safety during the visits could not be assured.
Instead of striking Marion, either parent could have carried Allen or Marion away from the altercation and spoken to them separately. Id. at 64. Marion D., Sr. made no effort to try to sit his son down or remove him from the fray in order to calm him. Id. at 74.
Couseling
Deanne H.-D. attended counseling at the Village from 1993-1998. As described above, primary issues were anger management, inappropriate discipline, and parenting. In her testimony, she acknowledged that her anger was a regular subject of the counseling. It was discussed at every session. The record demonstrates that she did not make significant progress in these areas. Perhaps because she felt she did not need to address any issues, counseling was not successful in either modulating her anger, which she demonstrated at supervised visits by continuing to use inappropriate discipline, or in fostering in her a meaningful understanding of her children and their needs. After visits were suspended in 1998, she also stopped going to counseling.
Deanne H.-D. also claimed she attended parenting classes, as part of her therapy at the Village. Exh. 33 at 18, 21. She also claimed she attended four one-hour sessions of an anger management program provided by the "alternate incarceration program" (AIC). Id. at 19. In addition, she stated she also took parenting classes at the AIC. Id. at 22.
Other Expectations
Deanne H.-D. was able to maintain adequate housing and income. She did not engage in substance abuse. Besides the criminal charges and ensuing probation, she had no further involvement with the criminal justice system.
Concerning Mr. D., he, too, failed to demonstrate compliance with the expectations.
Cooperation with DCF
He, too, did not attend the substantial majority of the case reviews CT Page 5592 held by DCF concerning Marion since 1995. Ms. Walters of DCF recalled him attending one in the several years she was the social worker on the case. Treatment plans were mailed to the parents when they did not attend the reviews.
Visitation
He had weekly separate, unsupervised visitation with all the children and with Marion alone. Eventually, due to his work schedule, his visits were scheduled on Sundays in the community. He did not follow through on these visits in a consistent manner. The children were disappointed, became angry, and acted out as a result. He missed numerous visits between June, 1993 and July 3, 1994. He did not appear between mid-July, 1994 and early September, 1994 and from mid-September to early November, 1994. Between June 1993 and September, 1994, he missed nineteen visits. Between November, 1994 and February, 1998, his attendance continued to be inconsistent.
In addition, he also had the opportunity to visit the children during the weekly scheduled visits at The Village and with DCF. He often missed these visits as well.
Eventually, Mr. D. requested that his additional unsupervised visits, which had been scheduled to accommodate his work schedule, be stopped.
Counseling
As Ms. Stevens-Castro explained, he was offered parenting classes. Exh. 49 at 82. He was also offered the opportunity to participate in family therapy at the Village. Id. at 83. He got little of therapeutic value from the supervised visits. Id.
He missed many of the sessions, as he acknowledged to Dr. Sadler. He never acknowledged the seriousness of mother's behavior. He did not intervene to protect the children from physical discipline by her. In the February, 1998 incident, he actively participated by engaging in inappropriate physical discipline of Marion.
During the period Ms. Rice had the case (February 1993 — January 1994), he never offered himself as a resource independently from Deanne H.-D., his wife. On various occasions, DCF explored this with him. He told DCF he could not do it and was not willing to do it. After this option was rejected, DCF pursued other avenues. Clearly, Mr. D. was not ready to be responsible for Marion. When Ms. Walters had the case, from January, 1995 until August, 1999, he did not offer himself as an independent resource either.[7] It was not until February, 2000 that CT Page 5593 he informed DCF that he and his wife had separated.
In her testimony, mother stated that, in the past, Mr. D. had rejected the idea of their separating so that he could be considered alone as a parental resource for Marion. In advance of trial, she filed divorce papers to help him gain custody of Marion, but she did not inform DCF that she had done so.
Other Expectations
Mr. D. remained employed and had adequate housing. He did not engage in substance abuse or become involved with the criminal justice system.
I. Evaluations By Mental Health Professionals
1. Dr. Freedman
Bruce Freedman, Ph.D., a licensed clinical psychologist, testified at trial. He conducted evaluations of mother, Marion D., Sr., mother's sister (Mrs. O.), her husband, the three older children, and also observed interactions between mother and the children. He prepared four reports. Exhs. 18-21, in 1992 and 1993.
During Dr. Freedman's observation of the mother-children interactions, mother grabbed Cesar's sweater, shook him gruffly, and yelled at him. Allen asked if mother was going to "whoop him." To Dr. Freedman, "[t]his disturbing sequence suggested the presence of much physical discipline at home. . . ." Exh. 18 at 8. It was "absolutely unnecessary." Id. He observed that mother showed "minimal affection and nurturance of these children." Id. At trial, he testified that the interactions he observed were some of the worst he had seen.
Allen, then age 3, explained to Dr. Freedman that his mother would tell him to put out his hand and then hit it with a belt. Id. at 11. She used to do this to Regina also and had "whooped her a lot of times." Id.
Dr. Freedman concluded that none of the children could be considered safe in mother's care. Exh. 19. He recommended that only supervised visitation occur. Exh. 20.
With regard to Marion D., Sr., Dr. Freedman interviewed him in March, 1993, after he married mother in January, 1992. Exh. 21. Dr. Freedman stated that Marion D., Sr. had little understanding of mother's history of child feeding problems and child abuse. Id. at 2. Dr. Freedman concluded that Marion D., Sr.'s presence in the home would be insufficient to insure the children's safety if they were returned. Id. CT Page 5594 He was found to have a lack of understanding of mother's serious emotional problems and poor parenting. Id. at 6.
In Dr. Freedman's view, Marion D., Sr. could have benefitted [benefited] from individual counseling. Dr. Freedman was concerned that Marion D., Sr. had said nothing about what had been wrong in the home. This meant that his involvement would not make safe a dangerous situation. In order to stand up for his own child he could have separated from mother and presented himself to be separately assessed as a parental resource, but never did, until shortly before trial.
Now, after Marion has been in placement virtually his entire life, and since he is in a good home with his siblings, it would be inappropriate to remove him from them. To do so would remove him from every source of security he has.
As to Mrs. O., Dr. Freedman found her to be intelligent and emotionally healthy. Exh. 21 at 5. She seemed to be a highly qualified guardian for the children. Id. at 6. He recommended that the O. couple be given serious consideration as custodians for the children. Id. at 7.
At trial, he was shown Exhs. 1 and 2 from Ms. Stevens-Castro's deposition (Exh. 49), concerning the two incidents at supervised visits in 1994 and 1998 where inappropriate discipline had occurred. He concluded that mother paid no attention to parenting advice. He found it especially significant that mother would, behave as she did in front of therapists. To him. it reflected mother's disregard for how other people view her.
2. Dr. Black
James C. Black, M.D., a board certified child psychiatrist, testified about his consultations concerning the older children. He was a staff psychiatrist and then a consultant to the Village between 1967 and 1999. Exhibit 55, his consultation of October, 1992, describes his assessments. As a result of the children becoming upset, he recommended diminishing the frequency of visitation and individual therapy with the children, and sessions together.
In May, 1993, he was consulted again concerning Allen. Exh. 54. He concluded that Allen had a reactive attachment disorder and that his ability to trust was impaired.
In addition, he provided an evaluation of Marion in 1996. Exh. 61. Marion was found to have engaged in oppositional behavior, and had characteristic attention deficit qualities, as well as a history of CT Page 5595 hyperactivity. At that time, medication was under consideration to help control his behavior. Individual psychotherapy was recommended.
Dr. Black stated at trial that Marion would require skilled parenting, by a patient person who had good anger management skills.
3. Dr. Mantell
David M. Mantell, Ph.D., testified as an expert in the field of clinical psychology. He evaluated the children pursuant to court order, observed parent and child interactions, and prepared a written report in 1995. Exh. 27, dated April 20, 1995. His evaluations at the time were preliminary in nature.
Dr. Mantell's report reflected his initial difficulty in obtaining information from mother. Id. at 5-6. Mother said that she attended counseling per court order, but that she did not need it. Id. at 7. At trial, he noted that mother was presenting evidence of a severe personality disorder. Therapy gains for her would, in all likelihood, be minimal.
Contrary to what she told Dr. Fisher in 1991, mother told Dr. Mantell that, of her children. only Cesar was physically abused, allegedly by Cesar G., Sr. Id. at 8.
To the court, Dr. Mantell's interview of Marion D., Sr. is especially significant. He stated to Dr. Mantell concerning the events leading to Regina's death:
 He remembers that he and his cousin were finishing a job one day, got home at 4:30 and the child was fine, his wife was cooking dinner, and he heard a big thump. He thinks she might have fallen asleep on the commode. She got up crying. She was gripping her hands tightly. Then she went out. He remembers that he tried to walk out on the porch for air. He had his wife call 911. He held the child, she looked like everything had just gone.
Id. at 9. He also said he told Regina to go to the bathroom. Id.
This recitation fundamentally contradicted what both he and mother had told Dr. Fisher in 1991; that Marion D., Sr. had not been present at the home until after the "thump" was supposedly heard resulting from the alleged fall from the toilet and after Regina's condition deteriorated. Over three years after the event he altered his version of his own CT Page 5596 participation in it. The only explanation for this change must have been a misguided desire to support mother's story as she faced serious criminal charges at the time.
Dr. Mantell termed mother to have adopted a "diffuse, dysfunctional, hostile stand." Marion D., Sr. was "acting in a subservient, compensatory fashion." Id. at 10.[8] Mother appeared to be "in control of the relationship." Id.
In his trial testimony, Dr. Mantell noted that Marion D., Sr. was capable of taking charge of circumstances, although he presented himself as passive. He found him to have below average intelligence.
In general circumstances where a relationship is unhealthy, Dr. Mantell recommends couple training and therapy or assertiveness training. Some parents may be helped to work as a team to secure child welfare or to separate. Dr. Mantell was limited in his assessment of these parents since he had not reviewed the police reports, medical records, various DCF documents, or Dr. Freedman's reports. He did note, however, that Marion D., Sr. approved mother's use of corporal punishment. There was no indication of any dissatisfaction in Marion D., Sr.'s relationship with mother. In Marion D., Sr.'s situation, if he stayed with mother, it would be hard to present himself as a safe resource. For him to separate, he probably would have had to address the situation in counseling. Counseling from his attorney could have assisted him.
Here, where a child had died and the mother had been charged with manslaughter, those involved, i.e. mother and Marion D., Sr., should have known that no spanking of the children should occur during visitation. He also noted that it was "alarming" that a parent would try to cope with a child (meaning Regina) who had been out of her care for a significant length of time, and who was medically fragile, by dealing with her eating difficulties through corporal punishment. Marion D., Sr. had no problem concerning mother's conduct involving Regina. Ordinary sensitivity clearly was lacking. Normally, such children are sheltered, not treated in such a manner.
4. Dr. Salguero
Carlos Salguero, M.D., a child psychiatrist, evaluated all four children in 1997. He prepared Exhs. 35-40, which reflect his evaluations. He testified at trial as an expert in his field.
As to Marion, his behavior had deteriorated significantly. He had been fighting, screaming a lot, and was very angry. Exh. 35. At that time, June, 1997, he was visiting his mother twice a week and his father for CT Page 5597 another hour per week. He was found to be a very intelligent child. Id. Medication was prescribed to decrease his oppositional behavior. Exh. 36.
Along with the other children, Marion was anxious about a possible return to his mother's care. Exh. 39 (7/23/97). Dr. Salguero stated, "The children's visitation to their mother is hampering the healing of the wounds they have suffered and the more they continue to visit her the more difficulties they continue to face." Exh. 39 at 2. He recommended cessation of the visits. Id.
As to Cesar, aggressive behavior with his siblings was noted. He expressed ambivalence about returning to his mother. Exh. 37 at 1. As the oldest child (then age 11), he felt responsible for deciding whether or not all the children should return to their mother. Id. Cesar also was found to be very intelligent. Continued therapy with his siblings was recommended. Id. In Dr. Salguero's view, expressed at trial. Cesar had repressed his knowledge of what had happened to Regina. Dr. Salguero did not see a strong attachment between Cesar and his mother.
As to Allen, again fighting with his siblings was reported. His anxiety was also described. Psychotherapy was recommended. Exh. 38.
Concerning Sierra, oppositional and destructive behavior was noted, as was her anxiety. Exh. 40. Continued play therapy was recommended. Id.
All of the children were seen as needing closure concerning their mother. He noted that mother had put the children "on the spot" by asking them not to call their former foster mother, Mrs. W., "grandmother," causing conflictual feelings.
5. Dr. Camli
Ozlem Camli, Ph.D., a licensed psychologist, testified concerning her observations and evaluations of Sierra, who was a student at Connecticut Children's Medical Center (CCMC) School. Sierra was placed for oppositional behavior and academic difficulties. Exh. 42. She was diagnosed as having Dysthemic disorder-early onset type, which is characterized by depressed/irritable mood. low self-esteem, poor concentration, and feelings of hopelessness. Id.
When discussion of her living arrangements and court hearings occurred in 1997, her anxiety increased significantly. Id. at 2. She was seen to need "a safe, structured and closely supervised home setting, where she will not feel threatened when she makes a mistake or when she experiences intense emotions." Id. at 3. CT Page 5598
Sierra attempted to avoid discussing her mother in therapy. Id. She was apprehensive and fearful. Id. at 3. Dr. Camli could not discuss Sierra's possible reunification with her mother "because it was so overwhelming and emotionally threatening to her." Id. at 4. She was seen as in need of an emotionally nurturing home and family. Without it, Dr. Camli thought it likely that she would grow up to be an "emotionally scarred individual." Id. at 4.
On days when she was to visit her mother, Sierra's social skills regressed. She would become more anxious.
6. Dr. Sadler
Richard B. Sadler, M.D., a board-certified psychiatrist, and child psychiatrist, testified as an expert witness. He prepared reports concerning the family in 1996 and 1999. In 1996, he evaluated Deanne H.-D. and Marion D., Sr., Mr. and Mrs. O., and all four children. He also observed interactions between these adults and the children. In August, 1999, he evaluated the children only. His reports of these evaluations are Exhs. 29 and 30.
A. The Children
At trial, Dr. Sadler stated that each child was doing better in 1999, after living with the O.s, than he would have predicted in 1996. With regard to Marion, in the earlier evaluation, Exh. 29, when Marion was four years old, Dr. Sadler found that he showed moderate oppositional behavior. Id. at 72. He was seen as a "significantly more difficult than average child to care for, although a reasonably skilled parent in a home/family setting should be expected to be adequate to meet Marion's needs." Id. Professional support would be needed to shape his educational programs and guide his caretaker. Play therapy was suggested. Id.
In 1999, Dr. Sadler found that Marion demonstrated considerable competence and social responsiveness. Exh. 30 at 4. "There was no suggestion of aggressive or destructive activities or behaviors." Id. He was seen to be "quite content with his current life." in a safe, secure and nurturing environment. Id. He "has made considerable developmental, intellectual and behavioral progress." while still evidencing an attention deficit disorder and indications of his "troubled. conflicted and stressful emotional/developmental background." Id. at 4. He was positively emotionally connected to his siblings, as well as to his aunt and uncle. He seemed to have only distant memories of his biological parents. Id. at 13. CT Page 5599
Allen was age seven when Dr. Sadler evaluated him in 1996. Dr. Sadler found him to be subdued and mildly depressed at that time. Exh. 29 at 72. Close clinical follow-up was recommended. Id. at 73. He also recommended a "richly verbally stimulating and interpersonally engaging environment" for him. Id.
When seen again in 1999, Allen was almost eleven years old. He, too, seemed to be doing well in the O. family. He was also doing well in school. Exh. 30 at 9. He was subdued, but alert. Id. at 10. While still mildly depressed, he was thriving with the O.s. Id. He had some fantasies about being reunited with his mother. Like Sierra and Marion, he was taking Ritalin to help control behavioral problems related to Attention Deficit Hyperactivity Disorder. Id. at 10, 13. He appeared to be developing well both emotionally and intellectually. Id. at 13.
In 1996, Sierra was seen at age eight by Dr. Sadler. At the time she was described as "a child who is emotionally and interpersonally adrift who may well have serious emotional disturbances." Exh. 29 at 73. She had "vivid recollections of physical punishments, traumas and death in her mother's home." Id. She noted that mother spanked her with a belt and a shoe, although the boys were hit the most. Both mother and Marion D., Sr. engaged in hitting. Id. at 20. She was in need of a "nurturing, structuring, child-oriented environment in order to give her a chance to make the emotional connections that are so desperately needed by this child." Id. at 74.
Sierra was observed again in 1999 at age twelve. She had made the greatest clinical change of the four siblings. Exh. 30 at 7. In contrast to her prior disorganized thinking, she presented herself in a much improved condition, although one characterized by a mild to moderate degree of anxiety. Id. No suggestion of a thought disorder was demonstrated. Id. at 8. She was taking Ritalin to help her concentrate in school. She had settled nicely into the O. home. Id. at 13.
In 1996, when Dr. Sadler evaluated Cesar, he was age ten. He stated to Dr. Sadler that he wanted to live with his mother, and with Marion D., Sr., to whom he referred as his father. Exh. 29 at 32. Cesar "demonstrates an intellectualized and fantasy oriented longing to be reunited with his mother. . . ." Id. at 75. He was at significant risk of emotional difficulty. Id.
In 1999, Cesar again expressed that he missed his mother. Exh. 30 at 10. He was quite positive about his life with the Os. Id. at 11. He rated his life as a 9 of 10 with zero being the worst he could imagine. Id. at 12. He was under considerable emotional stress, but coped with it in a competent and constructive manner. He appeared to be "tempering, CT Page 5600 somewhat, his fantasy of living with his mother." Id.
At trial, Dr. Sadler noted that his fantasy of a nurturing mother stands in the way of Cesar's growth and development. While it provides some emotional protection for him, it holds him back as well. That fantasy does not justify putting his life on hold and not proceeding to permanency. since the gain from doing so in the areas of clarity and safety would be more positive than the negative of maintaining the fantasy.
Dr. Sadler concluded, in general, about the children:
 My strong clinical impression, on the basis of my two separate assessments of the children and my previous assessment of the [O.s], suggests that a more positive result has been achieved for these four children that I would have predicted, even from my prior highly positive assessment of the [O.s] and of their ability to manage the severe difficulties that were demonstrated by these children. That the [O.s] have so well managed such four intense and highly stressed children within their household is an extraordinary testament to their abilities.
Id. at 14-15.
B. The Parents
1. Deanne H.-D.
Mother was evaluated by Dr. Sadler in May and June, 1996. She informed him that there had been no problems involving her care of her children. Exh. 29 at 55-56, 67. She had not made an effective effort to address the concerns raised by DCF. Id. at 67.
 [Deanne H.-D.] does not address the multiple bruises in multiple stages of healing that were observed on Regina or the reports of Regina drinking from the toilet. [She] did not express any significant concern that she would beat a 14 month old child for not eating. [She] shows no emotional response to or recognition of the multiple areas of failed parental empathy that so profoundly affected her children's development.[9]
Id. at 67-68. He found a "profound deficit in maternal empathy for the CT Page 5601 experience of her children." Id. at 68.
No substantial progress in addressing the issues was observed. Treatment of her personality style would be "exceedingly difficult and is highly unlikely to significantly improve the parental skills [of mother] within a time frame that would be of use to her children." Id. at 69. She described no benefit from four years of counseling and gave no indication of any issue which needed to be addressed. Id. at 70. She demonstrated an unwillingness to participate in an adequate treatment program. Id.
At trial, Dr. Sadler stated that he found no reason to hope that mother would be rehabilitated. Given her long history of saying there were no parenting difficulties, there was no reason to expect change.
2. Marion D., Sr.
Mr. D. was interviewed by Dr. Sadler in June, 1996.[10] He expressed his desire to help and support his wife. He had taken no action to understand or change any situation which was in effect when their relationship began. Exh. 29 at 52. He stated he had "almost no information regarding why her seven children were not in her care." Id. at 53. He also stated he had never observed any problem in her care of the children. Id. at 53, 54.
He acknowledged that DCF had informed him that his leaving his wife would facilitate his chances of his son's return to his care. Id. He had gone to counseling with his wife. Id. In his opinion, his wife really did not need any help. Id. He also acknowledged missing some visits with his son. Id. at 54.
Mr. D. stated that he had not involved himself in therapy or counseling. He attended mother's counseling, but mostly waited outside. "I went a couple of times. Mostly I was at work." Id. at 55.
Dr. Sadler found Mr. D. to be functioning in the lower range of the intellectually average person. Id. at 66. He expressed no concern regarding Regina's death. Id. at 67. He is not likely to provide any increased protection for a child in mother's care. "Whether through overt lying or ignorance or a convenient combination of the two, Mr. [D.] has neither demonstrated nor even verbally expressed thoughts about the need to protect children in the care of [mother]." Id. at 67. He, too, failed to address the treatment issues needed in order to protect his child. Id. at 69.
At trial, Dr. Sadler reiterated that the issues should have been clear CT Page 5602 to Mr. Davis. He was aware that remaining with mother would stand as a major factor against him in considering his ability to be a fit parent for Marion. After all, as Dr. Sadler stated, it does not take much to recognize that hitting a very young child with a belt is wrong. As Dr. Sadler observed, the fact that Mr. D. could say that mother was a perfectly good parent was astonishing. It stood as an indictment of his own ability to care for his own child.
With regard to the parent-children interaction, Dr. Sadler noted that "the activities demonstrated and the interpersonal relationships observed suggest strongly an underlying lack of connection and lack of empathy for and responsiveness to the children." Exh. 29 at 75. "[N]either Mr. or Mrs. [D.] demonstrate a care of or an acceptance of these children that is genuine, meaningful or substantial." Id.
Dr. Sadler recommended that none of the children should be allowed to live with either of their parents in any possible combination. To permit that would put that child at grave emotional risk due to the parents' emotional detachment. As to Deanne H.-D., such a child would be a risk of physical neglect or physical harm as well. Id. at 76-77.
7. Dr. Humphrey
Stephen M. Humphrey, Ph.D., a clinical psychologist, testified as an expert in that field. His curriculum vitae was admitted as Exh. 17 and his written report became Exh. 48. At the request of Cesar and Sierra's attorney, he evaluated them in October, 1999.[11] Prior to his evaluations, he reviewed an extensive list of documents concerning the family, including reports by Dr. Freedman Dr. Mantell and Dr. Sadler. Exh. 48 at 1-2.
As to Cesar, Dr. Humphrey found that he stated that he wanted to live with his mother. Id. at 5. He had formed an idealized conception of her and used "denial and fantasy to protect himself from the painful consequences of having to cope with his present reality." Id. at 6. He did not see the O.s as his psychological parents. Id. at 9. He was in need of a permanent, stable home environment, so that stability and closure in his life can be accomplished. Id. at 6. Dr. Humphrey noted Dr. Freedman's observations, when Cesar was age six, that mother was rough with the children, which Cesar should be able to recall. His idealization of his mother "directly contradicts his experiences with her." Id. Typically, children in this context remain loyal to their parents. "despite maltreatment." Id. (emphasis in original).
When asked how termination of his parents' rights would affect Cesar. Dr. Humphrey stated: CT Page 5603
 However, the psychological benefits that Cesar would derive from closure and a sure future outweigh the benefits of failing to promote his adoption by [the O. s]. It is likely that Cesar uses fantasy and denial to protect himself against the memories of things that he has reported to DCF workers and other professionals over the years.
Id. Dr. Humphrey recommended that Cesar's feelings of grief and loss should be dealt with by continuing to provide him with the current environment "where he is regularly supported, validated and loved." Id. at 7.
Like Sierra, Cesar did not want to be separated from his other siblings. Id. at 10. He and Sierra considered the O.s to be caring, capable adults who have adequately cared for them and provided for their needs. Id.
Concerning Sierra, it is clear she was "much more comfortable with the notion of being adopted by the [O.s] than her brother Cesar." Id. at 8. She presented with a flat affect, dysphoria, and had difficulty generating spontaneous thoughts. Id. Dr. Humphrey recommended continuing Sierra's ongoing psychotherapy.
Dr. Humphrey would not recommend separating the children. At trial, he emphasized the need for the children to have permanency and closure.
8. Steven Beck
Mr. Beck has an M.A. Ed. degree in counseling psychology. He is a licensed mental health counselor in Massachusetts. He has been a mental health professional for nine years, working with children and families. Fifty percent of his caseload involves working with traumatized children or children with specialized needs.
He has worked with the children at issue and the O.s for two years since the children moved to Massachusetts. He sees each child once a week for forty-five minutes each. The children have specialized needs. The O.s treat them lovingly and the children respond in the same way.
Mr. Beck recommended that the children have no contact with mother, including by correspondence or phone. Any such contact would be disruptive since the children are psychologically at risk. In particular, Sierra and Cesar's defenses concerning their mother are fragile. CT Page 5604
He believes that the O.s are the psychological parents for each child. With regard to Cesar, he lives in a state of denial concerning prior well-documented events. To Cesar, if his parent could have murdered his sibling, it would mean that he himself was bad, since he came from that environment. This state of denial is self-protective, it prevents him from re-experiencing the death of his sibling and the physical abuse which took place. He does not discuss his father, but Mr. Beck sees no negative consequences for Cesar from a termination of parental rights. Sierra is even more fragile; she suffers from fears and nightmares, including ones where blood is visualized.
Concerning Allen, who is somewhat depressed, some of his symptoms would likely get worse with maternal contact. He is also fragile. He anticipates retaliation; he invites it and expects it. As to Marion, like the other children, he does not wish to discuss his mother. Unlike them, he has no memory of being in parental care. He has not spoken of his father. Mr. Beck is unsure whether Marion has any present recollection of either of his parents.
Mr. Beck believes that the O. home is an appropriate permanent home for all four children. He sees all of these children as "up in the air" psychologically in terms of connections to others. Now they have a consistent, safe, loving home. This is important for repairing their lives.
Both Cesar and Sierra have stated that they do not wish to be adopted. While he may suffer grief from the process, it is to his Cesar's benefit to allow his current care-taker relationships to remain intact. Mr. Beck believes he will feel that he was protected by the State and will eventually come around on the subject of adoption.
As he noted, undoubtedly it is difficult for a child, due to loyalty, to say that he or she desires the legal severance of a parental relationship. These four children need the safety and security of permanence to help them address their own issues.
ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112
(c)(1). The court need not make such a finding, however, "if a court has CT Page 5605 determined at a hearing pursuant to subsection (b) of section 17a-110
[dealing with permanency planning for committed children] that such efforts are not appropriate." Id. The word "unreasonable" is the "linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof." (citation and internal quotation marks omitted.) Inre Amber B., 56 Conn. App. 776, 784 (2000). Our Supreme Court has found that "reasonable" is a term which varies according to its context and is synonymous with equitable, fair, and just, citing Webster's New International Dictionary (2nd Ed.). State v. Antrim, 185 Conn. 118, 122
(1981) (citations omitted). More recently, in the termination of parental rights context, the Appellate Court stated that "reasonable efforts mean doing everything reasonable, not everything possible." (citations and internal quotation marks omitted) In re Savanna M.,55 Conn. App. 807, 812-813 (1999); In re Jessica B., 50 Conn. App. 554,566 (1998).
In accordance with § 17a-112 (c)(1), DCF may meet its burden concerning reunification in one of three ways: (1) by showing that it made such reasonable efforts; (2) by showing that the parent was unable or unwilling to benefit from reunification efforts; or (3) if the court previously determined that such efforts were not appropriate. As to Deanne H.-D. and Mr. D., by clear and convincing evidence, DCF has established (1) and (2). It has established (3) as well.
Deanne H.-D. and Mr. D. were provided with supervised, therapeutic visitation with the children at the Village on a regular basis. In addition, until he asked for it to stop, Mr. D. had unsupervised visitation with Marion, and the other children. Both of these parents also were afforded the opportunity for counseling through the Village. Each was evaluated by mental health professionals in order to identify significant issues.
The evaluations, visitation and counseling were provided as part of DCF's reasonable efforts at reunification. The evaluations helped to identify the issues, such as anger management. inappropriate discipline, and recognition of the children's special needs. Based on the foregoing discussion, the court finds that these reunification efforts were thwarted by the parents.
Mother refused to accept suggestions, behaved as if the therapists were not there at the supervised visits, and only belatedly, and unconvincingly, acknowledged receiving any benefit from her counseling. She was diagnosed as someone who, in any event, even with professional help, was unlikely to improve. That she continued to engage in inappropriate discipline in a supervised visit, even after Judge CT Page 5606 Teller's decision, is additional evidence of her inability to or unwillingness to benefit from reunification efforts.
Mr. D. consistently failed to recognize the serious issues concerning his wife's parenting, disciplinary practices, and anger management skills. His record of even attending the visits was inconsistent. His record of attending counseling was worse. If he did show up, he usually sat outside. To the court, this behavior is telling. He declined to be involved. Instead, he just went along. Worse yet, he altered his version of the events leading to Regina's death in order to buttress mother's incredible story of that tragedy.
DCF advised him, more than once, that his chances of reunification would improve if he would present himself for evaluation as a separate. independent parental resource for Marion. He rejected this option. Later, he actively engaged in the February, 1998 incident in which Marion was inappropriately disciplined and injured at a supervised visit. The court agrees that his presentation of himself was "astonishing."
Mr. D. argues that he should have had earlier, separate, or better counseling or other services to help him recognize the issues and what he should have done concerning them. The court is unpersuaded. He agreed to the court-ordered Expectations after they were negotiated by counsel. He was offered parenting classes. He hardly attended the counseling. Except for one, he did not attend the periodic administrative case reviews. He would not even attend the second session of the psychiatric evaluation by Dr. Sadler. Ostensibly, he did little to find out about issues involving his wife's parental deficiencies even though they were the central focus of this entire matter dating from when the older children were removed in 1991. When mother stopped her counseling after the February, 1998 incident, he went along with this also. He had an attorney during the proceedings.[12] If the treatment plans, visitation, or counseling were inadequate, available remedies could have been pursued long ago.
The statutory duty to make reasonable efforts to reunify does not oblige DCF to accomplish a successful result. In re Natalia G.,54 Conn. App. 800, 803 (1999). Efforts at reunification require a constructive response from the parent if they are to be meaningful. Inre Savanna M., 55 Conn. App. 807, 813 (1999). Here, Mr. D. did not so respond.
In addition to having established both that it made reasonable efforts to reunify and that each of these parents were unable or unwilling to benefit from these efforts, DCF also established that. as noted, on June 9, 1998, the court determined that such efforts were no longer CT Page 5607 appropriate. The court's earlier findings that reunification efforts as to them were no longer appropriate were clearly correct, amply supported, and should not be disturbed.
As to Jimmy A., since he could not be located, even after diligent efforts, reunification efforts were impossible. Due to his lack of interest or inability to make himself available, reunification efforts involving him could not even be begun. The "law does not require a useless and futile act." In re Antony B., 54 Conn. App. 463, 476 (1999);In The Interest of Jessica M., 1999 Ct. Sup. 2170, 2190 (February 17, 1999) (Munro, J.). Clearly and convincingly, he was unable or unwilling to benefit from such efforts. In view of Cesar G., Sr.'s consent to the termination of his parental rights, the court need not make any findings as to him concerning reunification or statutory grounds.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B.,49 Conn. App. 510, 512 (1998), cert. denied, 247 Conn. 919 (1998). Conn. Gen. Stat. § 17a-112 (c)(3).
DCF has alleged the grounds of abandonment as to Jimmy A.; failure to rehabilitate as to Deanne H.-D. and Mr. D; and acts of commission/omission by Deanne H.-D. as to Marion. Finally. as to mother, petitioner alleges that she either killed Regina "through deliberate, nonaccidental act" or "committed an assault, through deliberate, nonaccidental act that resulted in serious bodily injury" to Regina. The court finds that DCF has proven each ground by clear and convincing evidence.[13]
1. Abandonment
General Statutes § 17a-112 (c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment." (citations and internal quotation marks omitted) In re Roshawn R.,51 Conn. App. 44, 52 (1998).
 The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express CT Page 5608 personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance.
Id. at 53 (citations and internal quotation marks omitted).
"Attempts to achieve contact with a child, telephone calls, the sending or cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of a child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied, 199 Conn. 809
(1986) (citation omitted). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child. has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id. at 209. The statutory term "`maintain' implies a continuing, reasonable degree of concern." Id. at 210.
The record shows, clearly and convincingly, that Jimmy A. abandoned Allen. He could never be located. Allen has had to go through his childhood, thus far, without knowing his father. Jimmy A. left his care entirely in the hands of others. His behavior, without question, constitutes abandonment.
2. Failure to Rehabilitate
This statutory ground for termination arises when "the parent of a child who has been found by the Superior Court to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112 (c)(3)(B). The court previously has found each child to have been "neglected," thus satisfying a statutory prerequisite.
The rest of the statute requires the court to find whether the facts encourage the belief that "such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112
(c)(3)(B). This portion of the statute requires the court to analyze a parent's rehabilitation "as it relates to the needs of the particular child" and determine whether such rehabilitation is foreseeable "within a reasonable time." In re Luis C., 210 Conn. 157, 167 (1989); In reHector L., 53 Conn. App. 359, 366-67 (1999). CT Page 5609
As the Appellate Court recently noted In re Sarah Ann K.,57 Conn. App. 441, 448 (2000), the critical issue is whether the parent "has gained the ability to care for the needs of the particular child at issue." (internal quotation marks and citation omitted.) At this adjudicatory phase, the questions are whether Deanne H.-D. was better able to be a parent to the children and Marion D., Sr. was better able to be a parent to Marion when the petitions were filed than at the time of their commitments. See In re Michael M., 29 Conn. App. 112, 126
(1992). As noted, the petitions were filed on November 23, 1998, almost six years after the children's neglect adjudications in December. 1992.
This type of inquiry "require[s] the court to obtain a historical perspective of the respondent's child caring and parenting abilities."In re Sarah Ann K., supra, 57 Conn. App. at 449. Based on the foregoing discussion, the evidence is clear and convincing that neither parent is able to be a parent to their respective children and that neither could become able to do so within a reasonable time.
(a) Deanne H.-D.
The issues concerning Deanne H.-D.'s parenting skills, disciplinary practices, and anger management were addressed by the agreed-upon court expectations. Counseling and supervised visitation were the key elements. They were provided on an on-going basis over a period of several years.
At the outset, the presenting issues derived from mother's history of harsh treatment of her children, including Cleo, Regina, and the three oldest children, Cesar, Sierra and Allen. Regina was severely beaten and suffered malnutrition in mother's care. The children were exposed to a pattern of excessive physical punishment, as confirmed by mother's statements, medical records, and the childrens' reports. Mother was convicted of cruelty. The children lived in an atmosphere where they were either subjected to beatings or witnessed them. Marion, who was born after Regina's death, was hardly in her care, but was subjected to her behavior at visits. After the neglect adjudication, mother used inappropriate discipline again at a supervised visit. This was a major subject of the 1997 trial and of Judge Teller's decision. Sadly, just as she ignored the DCF social workers, she ignored the court as well by engaging in inappropriate discipline yet again in 1998 after the decision was issued. Visitation had to be stopped because the children were once again in danger.
This history was compounded by mother's testimony at the trial of the petitions before this court. With no basis, she disputed Dr. Fisher's contemporaneous 1991 report of what she told him about the events. CT Page 5610
The court may properly give weight to the opinion of expert witnesses.In re Cesar G., supra, 56 Conn. App. at 295. Mother's pattern of behavior and deficiencies were also identified by the mental health professionals who evaluated her, particularly Dr. Sadler. The court gives less weight to his viewpoint of mother than Judge Teller did following the 1997 trial only because Dr. Sadler did not evaluate Deanne H.-D. again after 1996. Nevertheless, Dr. Sadler's opinion that it was unlikely that she would ever make significant progress has been borne out by future events. Mother still refused to acknowledge her own role in the events leading to Regina's death, except to say she could have called the ambulance sooner. As noted, the court finds her story of the tragedy to be laced with falsehood.
As to this ground, the opinions of the mental health professionals who recently evaluated the children are very significant. As noted, the question of a parent's rehabilitation must be considered as it relates to the needs of each child. In parental termination cases the court is entitled to give great weight to the views of professionals. In reChristina V., 38 Conn. App. 214, 221 (1995).
Each of these children has had the benefit of living with the O. family since 1998. While each, in his or her own way, is a troubled and damaged child, each made progress from when Dr. Sadler saw them first until he evaluated them again in 1999. They each have special needs, as outlined above. Each continues to make gains through therapy. The court credits Mr. Beck's view that contact between the children and their mother would be counter-productive. It would invite further damage to the children in their fragile emotional states.
Considering each child, it is abundantly clear that mother cannot assume a responsible position in any of the children's lives. She has not gained the ability to care for their needs. Even with the professional help she was offered or could be offered in the future, there is no basis on which to believe that the situation could change.[14]
There is, therefore, no reason to believe that she will be rehabilitated within a reasonable time. After all, the past must be seen as a basis for prediction of the future. This matter deals with events beginning several years ago. If rehabilitation was ever going to occur. it would have been before the petitions were filed.
(b) Marion D., Sr.
In connection with reunification, at 50-51, above, the court has addressed Mr. D.'s studied failure to recognize the issues. That CT Page 5611 discussion applies here as well and need not be repeated.
In their closings, concerning Mr. D. and rehabilitation, counsel for him and for petitioner both referred to the recent decision in In reWanda C., 1998 Conn. Super. LEXIS 2838 (October 13, 1998) (Quinn, J.). That case also concerned a father who would not separate from his wife in order to establish a safe environment for his child. Id. at p. 4. Mr. D.'s counsel argued that there, DCF "on a regular basis" asked the father to leave his wife. He noted that, in that case. "[t]hroughout the time [the child] was out of the home" the father was unwilling to take the necessary steps. Id. at 7. Mr. D. argues that DCF was less persistent in his case.
The issues were made clear to Mr. D., more than once, by DCF. They were also addressed by mental health professionals who evaluated him and who provided reports to the court. Then, Judge Teller made the issues clear again in his written decision. Thus, throughout these proceedings; Mr. D. was advised of what the issues for him involved and what was at stake, his relationship with Marion.
Well after the petition was filed, and long after Marion had spent virtually his entire life out of his care, Mr. D. separated from his wife. As noted in In re Wanda C., at p. 7, a belated recognition of the gravity of the situation is insufficient to constitute a demonstration of rehabilitation. In contrast to the father in Wanda C., Mr. D. has not "demonstrated the interest and skills to be a committed and loving parent." Id., p. 4. Marion's age and needs also must be considered. He is a very troubled child, in need of educational structure, nurturing, and attentive parenting. He has no meaningful memory of Mr. D., even though years of supervised and unsupervised visitation occurred. This is unsurprising in view of Mr. D.'s sporadic visiting of his child and his request that his unsupervised visitation cease. Based on the foregoing discussion, Mr. D. could not assume a responsible role in Marion's life within a reasonable time.
3. Acts of Commission or Omission
Petitioner also alleges that, as to Deanne H.-D., Marion has been denied, "by reason of an act or acts of parental commission or omission including, but not limited to . . . severe physical abuse or a pattern of abuse, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." Conn. Gen. Stat. § 17a-112
(c)(3)(C). The court already has addressed the applicable legal standards relating to proof of this ground in its Memorandum of Decision on Motions to Strike, dated December 22, 1999, at 4-9. CT Page 5612
The petition concerning Marion alleges, as to this ground that, all of the children were adjudicated as neglected on June 16, 1993. Further, it incorporates five paragraphs from Ground B (failure to rehabilitate), including that mother needed to address "parenting skills, discipline techniques and anger problems," but had been unsuccessful. Id., par. 30. It further alleges that the Court Expectations were issued on June 16, 1993, that she had not complied with them, and that her problems continued to exist. Id., pars. 31-32. Reference was made also to these issues being raised at the 1997 trial through the testimony of various professionals and being referenced in Judge Teller's decision. Id., pars. 33-34.
Petitioner further alleged that mother struck Cesar in 1994 at supervised visits. Id., pars. 48-49. Finally, the February, 1998 incident involving mother slapping Marion in the face and his father pushing him into a cabinet "causing a cut on his shoulder" was alleged. Id., par. 50. The court finds that petitioner has proved this ground by clear and convincing evidence.
The court concludes that Marion was not the victim of severe physical abuse at the February. 1998 incident. As noted in the Memorandum of Decision on the motions to strike, this incident alone did not amount to severe physical abuse. Id. at 7-8. This is the only incident alleged which involved Marion being physically struck.
A pattern of abuse, is however, a different matter. The children, including Marion, were adjudicated as neglected, due in large part to mother's lack of parenting skills, disciplinary practices and inability to control her anger. In this context, repeated inappropriate discipline of siblings at supervised family visits such as occurred in 1994 and 1998, amounts to a pattern of abuse. The evidence demonstrated that mother's visits always included the four children, including Marion. He was present to be subjected to a pattern of abuse in that mother repeatedly abused the children even when the visits were supervised.
In his 1997 decision, at 9, referenced in the petition under this ground, Judge Teller emphasized mother's inappropriate behavior towards the children and that Cesar was struck "during a visit supervised by the two therapists." Id. at 9. Further, Marion was referred to as a "high energy, socially inhibited, oppositional child." Id. at 11. Mother's "inability to empathize with the great and individualized emotional needs of each of her four children," id. at 13, including Marion, was cited also. All of these observations preceded the February, 1998, incident.
Thus, Deanne H.-D. was on notice to be on her best behavior before the CT Page 5613 occurrence. She could not control herself yet again. Marion was repeatedly slammed down and slapped by mother at this last visit. This was the culmination of a pattern of abuse of the children, including Marion.
Observing domestic violence is emotionally harmful to children. In reJeffrey T., 1998 Ct. Sup. 1100, 1102, 1105 (January 27, 1998) (Quinn, J.). Being the direct victim of it is harmful as well. Marion was denied the "care, guidance, or control" necessary for his physical and emotional well-being.[15]
4. Killing Of Or Assault Resulting In Serious Bodily Injury To Another Child
In its final ground, DCF alleges that, as to Deanne H.-D., termination is warranted under Conn. Gen. Stat. § 17a-112 (c)(3)(F), which provides:
 (F) the parent has killed through deliberate, nonaccidental act another child of the parent or has requested, commanded, importuned, attempted, conspired or solicited such killing or has committed an assault, through deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent:
As Judge Teller noted, in his Memorandum of Decision, at 8, even though she was acquitted of manslaughter, since a lesser standard of proof applies here, the court is not precluded from addressing these serious allegations. In re Noel M., 23 Conn. App. 410, 425 (1990). This court, in its Memorandum of Decision On Burden of Proof, dated February 23, 2000, already has determined that clear and convincing evidence is the appropriate standard of proof to apply to this ground.[16]
Based on the foregoing discussion, the court finds, by clear and convincing evidence, that DCF has proved this ground as well. As noted, Regina was in her mother's exclusive control and custody immediately preceding her injuries. The undisputed medical evidence demonstrates she received a blow to the top, rear of her head that could not have been caused by falling forward from a sitting position on the toilet. Deanne H.-D.'s version of events is not credited. She delayed seeking medical attention. To Dr. Fisher, she admitted repeatedly beating Regina over time. In her own contradictory testimony, she admitted beating Regina once, then twice. The other, belt-caused injuries inflicted on Regina on more than one occasion are classic signs of child abuse. Mr. D.'s contradictory versions of events also undermines mother's story. The court, by clear and convincing evidence, finds that she struck the blow CT Page 5614 to Regina's head. This blow was the result of an intentional, nonaccidental act.
Even where an injury is not the sole proximate cause of death, but is the "precipitating cause of death," a jury may find a defendant guilty of murder. State v. Morin, 180 Conn. 599, 608-609 (1980). Here, the court need not parse the differences in expression of the cause of death by Dr. Gilchrist and Dr. Fisher. The medical experts agreed that the blow to her head caused a serious injury to Regina. Just before the injury, she was functioning normally, but refused to eat. After it, she was in a coma and suffered cardiac arrest.
That is sufficient to sustain petitioner's burden of proof, since it has been shown that a deliberate assault resulted in "serious bodily injury" to Regina, as required by § 17a-112 (c)(3)(F). While the statute does not define the term, in an analogous context, Conn. Gen. Stat. § 53a-3 defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ." Regina's head injury meets this definition.
The court also has considered the applicability of this ground to Marion, who was not born at the time of Regina's death.[17] The court is mindful of the Supreme Court's decision in In re Valerie D.,223 Conn. 492, 517 (1992) ("Valerie D."), which found that § 45a-717
(f)(2), concerning parental acts of commission/omission, now contained in Conn. Gen. Stat. § 45a-717 (g)(2)(B) and Conn. Gen. Stat. §17a-112 (c)(3)(C) ("Ground C") could not involve "parental conduct by a pregnant woman with respect to her fetus." The Supreme Court declined to apply this ground to an unborn child. Valerie D., 223 Conn. at 516.
Subsection (F) was adopted in P.A. 98-241 along with subsection (G), reflecting substantive changes in legislative approach to the grounds for termination of parental rights. City of Shelton v. Commissioner ofEnvironmental Protection, 193 Conn. 506, 513 (1984). In so doing, it is presumed that the legislature intended to create a consistent body of law. Doe v. Doe, 244 Conn. 403, 428 (1998); In re Valerie D., supra,223 Conn. 524. Likewise, the legislature "in enacting statutes is presumed to be aware of the existence of other legislation on the same or related issues . . ." (citation omitted.) Id. Thus, when the new subsections were enacted in 1998, the legislature is presumed to have been aware of Ground C and caselaw interpreting it.
While the focus of Ground C is on parental conduct with respect to a child who is the subject of the petition, grounds F and E both address CT Page 5615 conduct related to "another child." Ground F, as stated above, discusses killing or assaulting "another child." Ground E which was also added to the statute after Valerie D., discusses failure to rehabilitate as to a child "under the age of seven years" where the parent's rights as to "another child" were previously terminated. In neither Ground F nor Ground E did the legislature provide that the conduct related to the "other child" had to have occurred subsequent to the birth of the subject child. If it had intended that meaning, it easily could have included such language.
While statutes concerning termination of parental rights are to be construed "strictly and narrowly," Valerie D., 233 Conn. at 514-515, such construction does not "abrogate the manifest policy motivating these statutes. . . ." Hunte v. Blumenthal, 238 Conn. 146, 153 (1996). Clearly, among the public policies motivating subsection F is the protection of children from injury. Conn. Gen. Stat. § 17a-101 (a);In re Sheneal W. Jr., 45 Conn. Sup. 586, 591-93, 599-600 (1999) (Foley, J.) (discussing legislative history of P.A. 98-241). There is no rational reason to exclude a child from protection against a parent who has killed another child or engaged in assault with resulting serious bodily injury to another child merely because he or she happened to be born only a few months after such conduct occurred. Statutes are to be construed in accordance with their "background and purpose, as well as with common sense." Conn. Bank Trust Co. v. Winters, 225 Conn. 146,158 (1993). They are also to read so as to avoid "bizarre results." (internal quotation marks and citations omitted). State v. Uretek,207 Conn. 706, 719 (1988). It would depart from such principles to exclude Marion from the ambit of Ground F.
This conclusion is supported also by new subsection (G), which clearly involves conduct predating the subject child's birth. There, a "sexual assault resulting in the conception of the child" is a ground for termination. Conn. Gen. Stat. § 17a-112 (c)(3)(G). Necessarily, the child had to be born later for his parent's rights to be terminated. Thus, the legislature went beyond Valerie D.'s definition of a child under Ground C for the purposes of Ground G.
The court notes also that in Valerie D., 223 Conn. at 517, one of the reasons for the court's construction was that § 45a-717 (f) required that the subject conduct justifying termination had to exist for at least one year. P.A. 98-241 eliminated this requirement. Further, inValerie D., at 223 Conn. 518-524, legislation concerning the treatment of pregnant substance abusers was considered as a factor in adopting the more narrow interpretation of Ground C. That factor is absent here.
Marion was unborn when the conduct which forms the basis of Ground F CT Page 5616 as to him occurred. It is irrelevant whether or not he existed at the time it occurred. This distinguishes Ground F from Ground C, where the subject child had to be in existence to be "denied . . . the care, guidance or control necessary for his physical, educational, moral or emotional well-being." Conn. Gen. Stat § 17a-112 (c)(3)(C). Accordingly, the court holds that Ground F may apply to a child who was not born when the subject conduct occurred. Therefore, it may apply to Marion.
DISPOSITION OF THE TERMINATION PETITION
In the disposition phase of a termination case, the court must consider whether DCF has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. § 17a-112 (c)(2); In re Juvenile Appeal (83-CD), 189 Conn. 276, 285
(1983). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5. Because of the deleterious effects of prolonged temporary placement, "time is of the essence," for each of these children. In re Antony B., 54 Conn. App. 463,476 (1999); In re Alexander V., 223 Conn. 557, 565 (1992). The Appellate Court has "consistently held that to allow a child to languish in foster care is not the child's best interest." In re Drew R., 47 Conn. App. 124,131 (1997).
The evidence is clear and convincing that termination is in all of the children's best interests. The three older children have been out of their parents' care for eight years and six months. Marion has been cared for by others only slightly less time, but for almost his entire life. The court credits the views of Dr. Sadler, Dr. Humphrey and Mr. Beck, the children's therapist, that they need permanency and closure. The children have made marked progress with the O.s. The court credits Dr. Sadler's view that what has been accomplished is a tribute to their abilities.
The needs for permanency ad closure particularly apply to Cesar, notwithstanding his stated preference for living with his mother and his opposition to adoption. Whether or not adoption is the eventual outcome for one or more is not this court's decision. The court also credits Dr. Sadler's, Dr. Humphrey's and Mr. Beck's undisputed views that Cesar is engaging in a fantasy concerning his mother as a self-protective device. Ultimately, the assurance of permanence, to which he is entitled, and which is in his best interest, will help him overcome the effects of the abuse to which he, too, was subjected.
Marion, the youngest and the child who appears to have the most significant special needs, would benefit the longest from termination of CT Page 5617 his parents' parental rights. He has no significant relationship with either parent, not even one based on fantasy. No purpose would be accomplished in denying termination as to him. Allen and Sierra will also benefit from termination by achieving permanence and closure.
Each of these troubled children are in the stable care of the O.s, and will be enabled to put the sad events of their early childhood behind them. Each of these children is entitled to permanency and stability as he or she grows up. If termination were denied, they would remain in prolonged foster care for no reason. They could be subjected to further legal proceedings concerning their guardianship. They have had assigned social workers and lawyers long enough. Without question, termination of their parents' parental rights is in their best interests.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112
(d). See In re Tabitha P., 39 Conn. App. 353, 362 (1995). A discussion of these factors follows.[18]
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF timely attempted to provide services to Deanne H.-D. and Marion D., Sr. DCF, through The Village, provided foster care. visitation and counseling to the children and the parents. The Village provided services to all of them, including referring the children for specialized schooling. Casework was also provided by DCF. No services could be provided to Jimmy A. since he could not be located.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF made timely efforts to reunify the children with Deanne H.-D. and Mr. D. Reunification efforts became impossible, futile, and I inappropriate due to their inability to or unwillingness to benefit from these efforts. No effort to reunify Jimmy A. could have been undertaken since he could not be located.
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order. CT Page 5618
Based on the foregoing discussion, the court finds that the court-ordered expectations were communicated to Deanne H.-D. and Mr. D., after these parents, through counsel, negotiated the same. The extent of their compliance is discussed above at 22-31. DCF complied with its obligations. Since he could not be located, no court-ordered expectations were entered as to Jimmy A.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
Based on the foregoing discussion, the court finds that all of the children are bonded to the O.s., their aunt and uncle. They had, as of the filing of the petitions, with the exception of Cesar, no significant emotional bonds to their parents. Cesar has a fantasy of a bond with his mother which is interfering with his emotional development. The children's ties to their former foster parents appear to have dissipated over time.
5) The age of the child.
Cesar is age fourteen, Sierra is age twelve, Allen is age eleven; and Marion is age eight. They are in the stable and nurturing setting provided by the O.s. Leaving them in the "limbo" of foster care would not be in their best interest. Over eight years in foster care is more than sufficient.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations. communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that neither Deanne H.-D. nor Mr. D. has made reasonable efforts to adjust their circumstances or conditions to make it in their respective children's best interests to return to either of them in the foreseeable future. Neither acknowledged the significance of the issues or adjusted his or her behavior in time to be of aid to their children. To the contrary, their behavior was such that contact with the children had to be terminated. Jimmy A. made no such effort of any kind as a parent. CT Page 5619
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, neither Deanne H.-D., Mr. D., nor Jimmy A. faced unreasonable interference from anyone or from economic circumstances. Their predicaments are consequences of their own actions and their failures to act.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interests of Cesar G., Sierra G., Allen H., and Marion D., Jr. for termination of parental rights to enter with respect to the mother, Deanne H.-D. and the fathers. Marion D., Sr.; Jimmy A.; and Cesar G., Sr. Accordingly. the court hereby grants the petitions to terminate the parental rights of Deanne H.-D., Marion D., Sr., Jimmy A., and Cesar G., Sr.
The court further orders that the Commissioner of DCF is appointed statutory parent to Cesar G., Sierra G., Allen H., and Marion D., Jr. The O.s have stated their willingness to adopt all four children. It is the court's direction that they receive first consideration. The Commissioner shall file with this court no later than sixty days following the date of judgment a written report of efforts to effect such permanent placement and file the further reports as are required by state and federal law.
Pursuant to Conn. Gen. Stat. § 46b-136, on September 16, 1999, the court appointed attorneys. to represent Deanne H.-D. and Marion D., Sr. at trial. The court will schedule a hearing to determine if either or both are able to pay, in whole or in part, the cost thereof in order to determine whether costs shall be assessed against them. Each is directed to submit a financial affidavit on or before that date; their personal presence in court on that date is excused.
It is so ordered.
 BY THE COURT ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT